Affirmed and Opinion filed March 27, 2008








Affirmed and Opinion filed March 27, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00622-CV

____________

 

MICHAEL V. KELLY, II, M.D. AND
MICHAEL V. KELLY, II, M.D., P.A. D/B/A AESTHETIC SURGERY CENTER OF HOUSTON;
AMIT ANNAMANENI, M.D. AND RESPIRATORY CENTER OF NORTH HOUSTON, P.A.; LUIS
ENRIQUE CASTILLO, M.D. AND NORTH HOUSTON INFECTIOUS DISEASE ASSOCIATES
CORRECTLY NAMED NORTH HOUSTON INFECTIOUS DISEASE ASSOCIATES, P.A.; AND HOUSTON
NORTHWEST PARTNERS LTD. D/B/A HOUSTON NORTHWEST MEDICAL CENTER; Appellants

 

V.

 

ISIDRO RENDON, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE OF YOLANDA LEAL RENDON; JULIAN RENDON; AND LAUREN
RENDON;
Appellees

 



 

On Appeal from the 80th
District Court

Harris County, Texas

Trial Court Cause No. 2007-02313

 



 

O P I N I O N








Appellees, Isidro Rendon, individually and as
representative of the estate of Yolanda Rendon, Julian Rendon, and Lauren
Rendon, filed suit against appellants, Michael V. Kelly, II, M.D. and Michael
V. Kelly, II, M.D., P.A. d/b/a Aesthetic Surgery Center of Houston (collectively
ADr. Kelly@); Amit
Annamaneni, M.D. and Respiratory Center of North Houston, P.A. (collectively ADr. Annamaneni@); Luis Enrique
Castillo, M.D. and North Houston Infectious Disease Associates, correctly named
North Houston Infectious Disease Associates, P.A. (collectively ADr. Castillo@); and Houston
Northwest Partners Ltd. d/b/a Houston Northwest Medical Center (AHouston Northwest@), for medical
malpractice.  Appellants each filed objections to appellees= expert witness
reports and moved to dismiss appellees= suit pursuant to
section 74.351 of the Texas Civil Practice and Remedies Code.  The trial court
denied appellants= motions.  Appellants then filed this
interlocutory appeal contending the trial court abused its discretion when it
denied their motions to dismiss.  We affirm.

Factual and Procedural Background

On September 20, 2004, forty-three year old Yolanda Rendon
consulted Dr. Kelly complaining of weakness and protrusion of the abdomen.  Dr.
Kelly examined Ms. Rendon and recommended she have diastasis recti
abdominoplasty surgery, a surgical procedure commonly called a tummy tuck.  On
October 20, 2004, Ms. Rendon had preoperative lab work performed with many
bacteria noted in the urine.  No further lab work was done and  no preoperative
antibiotic therapy was ordered.  On November 1, Dr. Kelly performed the tummy
tuck procedure on Ms. Rendon with no complications reported.

On the evening of November 2, Ms. Rendon experienced a
fever of 101.3.  The Northwest Houston nurse contacted Dr. Kelly by telephone. 
Dr. Kelly ordered Tylenol for the fever.  Dr. Kelly did not order any lab work
or x-ray testing and did not go to the hospital to evaluate Ms. Rendon=s condition.








Beginning soon after midnight on November 3, Ms. Rendon=s condition began
to  rapidly worsen.  In addition to fever, Ms. Rendon experienced nausea,
vomiting, burning abdominal pain, decreased urine output that was dark and
concentrated, and weakness.  The nurse determined Ms. Rendon was experiencing
decreased oxygen saturation and her lungs were congested.  Despite Ms. Rendon=s deteriorating
condition, the nurses made no effort to contact Dr. Kelly.  Dr. Kelly finally
saw Ms. Rendon at 10:00 a.m. the morning of November 3.  Dr. Kelly concluded
Ms. Rendon=s fever was caused by her getting out of bed.  Dr.
Kelly ordered no diagnostic tests, discontinued the Tylenol and started her on
pain medication and an oral antibiotic.

About noon on November 3, Ms. Rendon=s oxygenation
level continued to decrease and she complained of dizziness.  The nurses
started Ms. Rendon on supplemental oxygen therapy that resulted in a small
increase in Ms. Rendon=s oxygenation level.  The duty nurses did
not report this development to Dr. Kelly.

During the afternoon of November 3, Ms. Rendon=s condition
continued to worsen as it was determined her urine output over the past eight
hours was only fifty milliliters.  When the nurses did contact Dr. Kelly, he
ordered additional supplemental oxygen and ordered a chest x-ray, which was
performed at 2:00 p.m.  This x-ray revealed no acute disease.  At 4:30 p.m.,
the nurses again contacted Dr. Kelly by telephone and he ordered a CBC test and
IV fluid hydration.  The CBC test noted the white blood count was at a normal
level but with bands exhibiting high critical at 40%.  Starting at 4:31 p.m.
and continuing for the rest of the evening, Ms. Rendon=s condition
severely deteriorated.  Ms. Rendon=s blood pressure
was critically low and she required continued supplemental oxygen therapy to
maintain her oxygen saturation levels.  At 5:00 p.m., a Foley catheter was
inserted and Ms. Rendon produced only a small amount of urine, which was cloudy
and had a foul odor.  Throughout the afternoon of November 3, Ms. Rendon was
kept on the regular post op inpatient unit.








At 6:00 p.m., Dr. Kelly consulted with Dr. Annamaneni, a
critical care specialist and pulomonologist.  Dr. Annamaneni saw Ms. Rendon an
hour later and ordered she be transferred to the intensive care unit (AICU@).  Dr. 
Annamaneni noted Ms. Rendon had fever, tenderness in the midepigastric and
lower rib cage areas, feeble pulse, headache, shortness of breath, and severe
hypotension.  Dr. Annamaneni also noted Ms. Rendon complained of having
burning, crawling pain extending from below the left breast area all the way to
the left ankle for the last day or so.  Dr. Annamaneni=s differential
diagnosis included likely sepsis and septic shock, and he noted the source
could be the abdomen, urinary tract infection, or the lungs.  Ms. Rendon=s white blood
count was now twenty-three.  As part of his transfer of Ms. Rendon to the ICU,
Dr. Annamaneni ordered additional tests.  Following Dr. Annamaneni=s evaluation, Ms.
Rendon was transferred to the ICU at 7:45 p.m.  

At 7:50 p.m., Dr. Castillo, an infectious disease
specialist, assessed Ms. Rendon and noted she looked acutely ill with low blood
pressure, elevated heart rate, edema of the abdomen, and erythema.  In
addition, Dr. Castillo noted Ms. Rendon=s abdomen was so
tender he could not deeply palpate it.  Dr. Castillo noted Ms. Rendon was in
shock two days after her abdominoplasty, this shock was probable septic, and
the operative site was the most likely source of infection.  Dr. Castillo then
recommended Ms. Rendon have a CT scan of her abdomen and pelvis.  However, he
did not order the CT be performed, nor did Dr. Kelly or Dr. Annamaneni.

At 9:30 p.m., Ms. Rendon=s condition was so
critical, she was started on two pressor medications to keep her systolic blood
pressure up.  At 10:00 p.m., Ms. Rendon complained of pain of such severity in
her abdomen and legs that Dr. Annamaneni ordered she be given morphine every
two hours as needed for pain.  Ms. Rendon developed generalized edema and a
third medication was added at 11:45 p.m. for blood pressure support.  Ms.
Rendon had been started on two intravenous antibiotics at 7:50 p.m. and at
11:50 p.m., a third antibiotic was added.








As November 3 came to a close, all three doctors treating
Ms. Rendon agreed she was in septic shock, but none recommended she be taken
back to surgery for exploration and drainage of the surgical wound.

Throughout November 4, Ms. Rendon=s condition
continued to decline.  Ms. Rendon=s white blood
count was high and continued to increase.  She continued to receive morphine
for the severe pain she suffered in her abdomen and legs.  Ms. Rendon also
began to experience additional complications as a result of the severe sepsis:
pulmonary edema, kidney failure, and multi-system organ failure.  At 5:30 p.m.,
Dr. Kelly aspirated a small amount of fluid from the lower area of the
abdominal wound, which was sent to the lab for testing.

On November 5, Ms. Rendon had severe difficulty breathing,
which required she be intubated and placed on a ventilator.  At 9:40 a.m., the
lab notified the ICU that the body fluid collected by Dr. Kelly the previous
evening was positive for Beta Hymolytic Streptococcus Group A bacteria.  Dr.
Kelly noted the lab results revealed necrotizing fasciitis.  Also on November
5, Dr. Castillo called in another surgeon for evaluation of Ms. Rendon for a
possible return to surgery for debridement of the necrotizing fasciitis. 
Additional antibiotic therapy was also ordered.  While Dr. Castillo agreed Ms.
Rendon had to be taken back to surgery for exploration, drainage, and
debridement of her abdominal wound, because of her critically low platelet
count, her return was delayed while she was given platelets and fresh, frozen
plasma.








Ms. Rendon was taken into surgery at 9:05 p.m. in critical
condition.  While Ms. Rendon was in the operating room, a code was called at
9:27 p.m. and all efforts to resuscitate her were unsuccessful with those
efforts ending at 9:45 p.m.  Prior to the code, Dr. Kelly opened the surgical
wound and discovered a considerable amount of necrotic fatty tissue and
suctioned off the necrotic tissue and a large amount of murky fluid from Ms.
Rendon=s abdomen.  Dr.
Kelly did not send any of the removed necrotic tissue or the fluid to
pathology, but instead, discarded it.  The Death Summary, signed by Dr. Kelly
noted the diagnoses at death of Adiastasis recti@[1] and necrotizing
fasciitis.  Dr. Kelly also signed Ms. Rendon=s Certificate of
Death, which noted the immediate cause of death to be septic shock with the
underlying cause of necrotizing fasciitis.

On November 7, 2004, Dr. Albert Chen conducted an autopsy. 
Dr. Chen issued a Preliminary Report on November 7, 2004.  Dr. Chen issued his
Final Report on January 19, 2005, and a Supplemental Report on September 14,
2006.  Dr. Chen concluded Ms. Rendon died as a result of complications from
necrotizing fasciitis.

Appellees eventually filed a health care liability lawsuit
against appellants.  Pursuant to section 74.351 of the Texas Civil Practice and
Remedies Code, appellees served on appellants the reports of six different
experts: (1) Dr. Hubert Weinberg, a board certified plastic surgeon; (2) Dr.
Richard F. Edlich, a board certified general and plastic surgeon; (3) Dr. Paul
Marik, who is board certified in internal medicine and critical care medicine;
(4) Dr. C. David Bakken, who is board certified in internal medicine and
infectious disease; (5) Lisa Ruth-Sahd, a registered nurse certified in critical
care and emergency nursing; and (6) Sharla Shumaker, a registered nurse with
experience in critical care nursing.  In response, appellants, arguing the
reports were deficient, filed objections to each of the expert reports and
moved the trial court to dismiss appellees= suit.  Following
a hearing, the trial court denied appellants= motions. This
interlocutory appeal followed.

Discussion








In this appeal, each set of appellants filed separate
briefs raising issues challenging the trial court=s denial of their
motions to dismiss.  As might be expected, there is significant overlap between
many of these issues.  Therefore, to more efficiently resolve this appeal, and
for the sake of clarity, we will consolidate these common issues and address
them together.  These consolidated issues can be broken down as follows: (1)
the qualifications of some or all of appellees= experts to render
expert opinions against appellants; (2) the adequacy of the appellees= expert reports as
some fail to name a specific defendant; and (3) the adequacy of the appellees= expert reports on
the appropriate standard of care and on causation.  After addressing these
consolidated issues, we will then turn to the remaining issues raised by a
single appellant.

I.        Expert
Report Requirements








This is a health care liability lawsuit governed by chapter
74 of the Civil Practice & Remedies Code.  Tex. Civ. Prac. & Rem. Code
Ann. ' 74.001 et seq.
(Vernon 2005).  Under these provisions, a claimant is required to produce an
expert report within 120 days of the date the claim is filed.  Id. at ' 74.351(a).  Under
the statute, the expert report must provide a fair summary of the expert=s opinions
regarding the applicable standards of care, the manner in which the care
rendered by the defendant physician or health care provider failed to meet the
standards, and the causal relationship between that failure and the injury,
harm, or damages claimed.  Id. at ' 74.351(r)(6).  An
expert report need not marshal all of the plaintiff=s proof, but it
must include the expert=s opinion on each of the elements
identified in the statute.  See Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 878 (Tex. 2001) (applying predecessor statute). 
In setting out the expert=s opinions on each of these elements, the
plaintiff is not required to present evidence in the report as if it were
actually litigating the merits at this preliminary stage of the lawsuit.  Id.
at 879.  Indeed, the information in the report can be informal as it does not
have to meet the same standards as evidence offered in a summary judgment
proceeding or at trial.  Id.  The expert report is not required to prove
the defendant=s liability.  See Russ v. Titus Hosp. Dist.,
128 S.W.3d 332, 341 (Tex. App.CTexarkana 2004, pet. denied) (applying
predecessor statute).  Instead, the report must provide only enough information
to fulfill two purposes: (1) it must inform the defendant of the specific
conduct the plaintiff has called into question and (2) it must provide a basis
for the trial court to conclude that the claims have merit.  Palacios,
46 S.W.3d at 879.

          In
deciding whether the statutory standard has been met, the trial court examines
only the four corners of the expert=s report and
curriculum vitae.  Mem=l Hermann
Healthcare Sys. v. Burrell, 230 S.W.3d 755, 758 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  If the trial court determines the expert report does
not represent a good faith effort to comply with the statutory definition, then
the trial court, subject to its discretionary authority to grant a thirty day
extension to cure the deficiencies in the report, must grant a motion to
dismiss challenging the report=s adequacy.  Tex. Civ. Prac. & Rem.
Code Ann. ' 74.351(c), (l). 

II.       The
Standard Of Review

We review a trial court=s ruling as to the
adequacy of an expert report under an abuse of discretion standard.  Estate
of Regis ex rel. McWashington v. Harris County Hosp. Dist., 208 S.W.3d 64,
67 (Tex. App.CHouston [14th Dist.] 2006, no pet.).  The trial court
abuses its discretion if it acts in an arbitrary or unreasonable manner without
reference to any guiding rules or principles.  Burrell, 230 S.W.3d at
757.  We may not reverse a trial court=s discretionary
ruling simply because we might have decided it differently.  Id.

III.      Are
Appellees= Experts Qualified To Render
Opinions Against Appellants?

A.      Appellees= Physician Experts

Each of the physician appellants contend some or all of
appellees= doctors are not qualified to render expert opinions
against them.  In their challenges to appellees= physician experts,
appellants attempt to unduly limit the field of experts qualified to render
opinions against them to (1) doctors licensed only in the State of Texas; (2)
who practice in the same medical discipline; and (3) in the same type of
hospital as each appellant.  The statute does not require such specificity when
deciding a challenge to an expert=s qualifications.








An expert providing opinion testimony regarding whether a
physician departed from the accepted standards of health care must satisfy the
requirements set forth in section 74.401. Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(5)(A). 
Section 74.401 provides:

(a) In a suit involving a health care liability claim against a
physician for injury to or death of a patient, a person may qualify as an
expert witness on the issue of whether the physician departed from accepted
standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was
practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the
diagnosis, care, or treatment of the illness, injury, or condition involved in
the claim; and

(3) is qualified on the basis of training or experience to offer an
expert opinion regarding those accepted standards of medical care.

(b) For the purpose of this section, Apracticing medicine@ or Amedical practice@ includes, but is not limited to,
training residents or students at an accredited school of medicine or
osteopathy or serving as a consulting physician to other physicians who provide
direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of
training or experience, the court shall consider whether, at the time the claim
arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience
in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services
relevant to the claim.

* * *

(g) In this subchapter, Aphysician@ means a person who is:

(1) licensed to practice medicine in one or more states in the United
States ... 

Id. ' 74.401.

 

 








1.       Dr.
Kelly=s Qualification Challenges

a.       Dr.
Edlich

Dr. Kelly initially contends Dr. Edlich is not qualified to
provide expert opinions because, in Dr. Kelly=s view, he is not
currently practicing medicine in a field relevant to the claims against Dr.
Kelly and also was not doing so when Dr. Kelly treated Ms. Rendon.  We
disagree.  The combination of Dr. Edlich=s report and
curriculum vitae establish he is still practicing medicine as a physician board
certified in both general surgery and plastic surgery, and he has experience
treating patients with the same condition as Ms. Rendon.  As this health care
liability case involves the care of a patient following plastic surgery, we
hold Dr. Edlich meets the requirements set forth in section 74.401(a)(1) of the
Civil Practice and Remedies Code.  See Sanjar v. Turner, --- S.W.3d ---,
2008 WL 441817, at *3 (Tex. App.CHouston [14th
Dist.] Feb. 19, 2008, no pet. h.) (citing In re Stacey K. Boone, P.A.,
223 S.W.3d 398, 407 (Tex. App.CAmarillo 2006, no pet.) (holding cardiologist
was qualified to render expert opinion as to general surgeon=s care because
opinion was on post-operative therapy and surgeon participated in management of
that therapy)).

b.       Doctors
Bakken and Marik

Next, Dr. Kelly attacks the credentials of both Dr. Bakken,
an internal medicine and infectious disease physician, and Dr. Marik, an
internal medicine and critical care physician,  to render opinions on the
standard of care for a plastic surgeon such as Dr. Kelly.  Once again, we
disagree.








Here, Dr. Kelly takes the position that both Dr. Bakken and
Dr. Marik are not qualified to render opinions against him because their
medical specialty is in a different medical discipline from his own.  However,
the statute does not require a medical expert be practicing in the exact same
field as the defendant physician, but instead must only be actively practicing
medicine in rendering medical care services relevant to the claim.  Tex. Civ.
Prac. & Rem. Code Ann. ' 74.401(c)(2).  Here, the relevant medical
services are those for a post-surgical patient showing the signs and symptoms
of infection.

In his report, Dr. Bakken states he has thirty-three years
of experience specializing in infectious disease.  Dr. Bakken also states he
has Atreated many
patients in the past with similar conditions as [Ms.] Rendon.  As [an]
infectious disease specialist, [he has] been consulted multiple times for patients
with diagnoses of postoperative wound infections, sepsis, and necrotizing
fasciitis.@  In his report, Dr. Marik states he has twenty-five
years experience in the fields of pulmonary and critical care medicine and is a
professor of medicine and chief of the division of pulmonary and critical care
medicine at Thomas Jefferson University.  Dr. Marik also states he has Atreated many
patients diagnosed with the same conditions as [Ms.] Rendon, including
post-operative infection, sepsis, septic shock syndrome, and necrotizing
fasciitis.@  Because both Dr. Bakken and Dr. Marik have extensive
education, training, and experience in treating patients similarly situated to
Ms. Rendon, they are qualified to render an opinion on the standard of care at
issue in this case.  See Sanjar, --- S.W.3d ---, 2008 WL 441817 at *3; see
also Blan v. Ali, 7 S.W.3d 741, 746B47 (Tex. App.CHouston [14th
Dist.] 1999, no pet.) (holding, in a summary judgment case, that  an expert
physician-witness in a healthcare liability case need not practice medicine in
the same field as the defendant physician but only establish they are qualified
to render an opinion on the condition involved in the claim).

2.       Dr.
Castillo=s Qualification Challenge








Dr. Castillo only challenges the qualifications of Dr.
Edlich.  In support of his position, Dr. Castillo argues the medical services
relevant to appellees= claims Aare the services
provided by an infectious diseases consultant requested to provide specialized
knowledge about the management of antibiotic therapy for a patient following
abdominoplasty and to assume in lieu of the attending plastic surgeon
the antibiotic therapy for the patient.@  Dr. Castillo
then goes on to conclude that since Dr. Edlich is a plastic surgeon and not an
infectious disease specialist, Dr. Edlich is not qualified to render an expert
opinion against him.

While Dr. Castillo is correct Dr. Edlich is a plastic
surgeon and not an infectious disease specialist, we do not agree this fact
automatically precludes Dr. Edlich from rendering an expert opinion against an
infectious disease expert.  See Broders v. Heise, 924 S.W.2d 148, 154
(Tex. 1996) (applying predecessor statute).   In his report, Dr. Edlich states:
AI have treated
many patients with the same condition as [Ms.] Rendon.  I have performed
diastasis recti abdominoplasty surgery on numerous occasions.  I have also
diagnosed and treated patients who have been diagnosed as having necrotizing
fasciitis.@  For the same reasons we found Dr. Bakken and Dr.
Marik qualified to render an opinion relative to Dr. Kelly, we hold Dr. Edlich
is qualified to render an opinion regarding Dr. Castillo=s treatment of Ms.
Rendon.  See Sanjar, --- S.W.3d ---, 2008 WL 441817 at *3; see also
Blan, 7 S.W.3d at 746B47.

3.       Dr.
Annamaneni=s Qualification Challenges

Dr. Annamaneni, a pulmonologist and critical care
specialist, challenges the qualifications of each of appellees= physician experts
to render expert opinions against him.[2] 
According to Dr. Annamaneni, the medical services relevant to appellees= claims against
him are the services provided by a pulmonologist/critical care specialist
practicing in a private as opposed to a public hospital who was consulted by
the operating plastic surgeon to evaluate a patient in multi-system organ
failure and to manage that patient=s hemodynamics and
who then brought in an infectious disease specialist to evaluate, manage, and
treat a suspected infectious process.








Based on that statement of the medical services at issue,
Dr. Annamaneni then contends Dr. Weinberg, Dr. Edlich, and Dr. Bakken all lack
the training, education, and experience to serve as medical experts against
him.[3]  
For the reasons stated in sections III(A) (1) and (2) above, we disagree these
doctors are not qualified to render an opinion against Dr. Annamaneni.  Dr.
Annamaneni also asserts that Dr. Marik, a pulmonologist and critical care
specialist like himself, is not qualified to render an opinion in this suit
because he practices in a large, public hospital setting as opposed to a
private hospital setting.  Dr. Annamaneni does not cite any legal authority for
this unique argument, and we are not persuaded the public or private status of
a hospital impacts the standard of care expected of a doctor practicing in that
hospital.

Finally, Dr. Annamaneni contends appellees= physician experts
are not qualified under the statute because they are not licensed in the State
of Texas.  Because the plain language of the statute defines Aphysician@ to include a
person licensed to practice medicine in one or more states in the United States
and each of appellees= physicians meets that requirement, we
refuse to find them unqualified on that basis.  Tex. Civ. Prac. & Rem. Code
Ann. ' 74.401(g)(1).  
Having addressed each of Dr. Annamaneni=s qualification
arguments, we hold that Dr. Edlich, Dr. Bakken, and Dr. Marik are qualified to
render an expert opinion against Dr. Annamaneni.  See Sanjar, --- S.W.3d
---, 2008 WL 441817 at *3; see also Blan, 7 S.W.3d at 746B47.

B.      Appellees= Nurse Experts








In addition to the reports of the four physicians,
appellees also filed reports prepared by two nurses.  Each appellant challenges
these reports by pointing out that nurses are not qualified under the statute
to render expert opinions on the issue of causation.  We agree with appellants
that, under the statute, a nurse is not qualified to render an opinion on
medical causation.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(5)(C). 
Accordingly, the reports of Nurse Shumaker and Nurse Ruth-Sahd, standing alone,
can not meet the statutory report requirement on medical causation.  Id. 
However, this does not end our analysis because appellees filed physician
reports in addition to the reports prepared by the nurses.

In the present case, Dr. Edlich, Dr. Bakken, and Dr. Marik
reviewed the report of Nurse Ruth-Sahd and incorporated it by reference into
their own reports.  Each physician then relied on Ruth-Sahd=s report in
rendering their own opinions regarding the standard of care and medical causation
as it applies to Houston Northwest.  While a nurse=s report, standing
alone, is inadequate to meet the requirements of the statute as to medical
causation, nothing in the health care liability statute prohibits an otherwise
qualified physician from relying on a nurse=s report in the
formation of the physician=s own opinion.  See Tex. R. Evid. 703 (stating an expert may base his
opinion on facts or data that is not admissible in evidence if it is of a type
reasonably relied on by experts in that particular field); see also Packard
v. Guerra, --- S.W.3d ---, 2008 WL 516560 at *18B19 (Tex. App.CHouston [14th
Dist.] Feb. 25, 2008, no pet. h.) (holding physician experts could rely on the
expert opinion of an attorney in the formation of their own opinions regarding
the standard of care and causation).  Because Dr. Edlich, Dr. Bakken, and Dr.
Marik incorporated Nurse Ruth-Sahd=s report into
their own and relied on it in the formation of their opinions regarding the
standard of care and causation as it applies to Houston Northwest, we conclude
the trial court did not abuse its discretion in considering Nurse Ruth-Sahd=s report in its
determination of Houston Northwest=s motion to
dismiss since it had become part of the reports of appellees= physician
experts.








We overrule appellants= issues
challenging the qualifications of appellees= expert witnesses.[4]

IV.      Did
Appellees= Expert Reports Fail To Address Any
Appellants?

Dr. Castillo, Dr. Annamaneni, and Houston Northwest point
out that Dr. Weinberg does not address their role in the events underlying this
lawsuit.  Dr. Castillo also complains Dr. Marik does not address Dr. Castillo=s role in his
report.  Appellants are correct that Dr. Weinberg=s report does not
address any appellant=s actions except those of Dr. Kelly, and
Dr. Marik does not address Dr. Castillo.  Therefore, if these two reports were
the only reports filed by appellees, then the trial court would have abused its
discretion in finding appellees had met the statutory expert report requirement
as to each appellant.  See Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(a)
(requiring a health care liability plaintiff to serve an expert report
addressing each physician or health care provider defendant).  However, there
is no requirement that a health care liability plaintiff file a single, all
encompassing report.  Id. ' 74.351(i).  Here,
in addition to Dr. Weinberg=s and Dr. Marik=s reports,
appellees filed expert reports by two other physicians, as well as two nurses.
Thus, when all of appellees= expert reports are considered together,
they address all appellants. Therefore, the fact Dr. Weinberg=s report addressed
only Dr. Kelly and Dr. Marik=s ignored Dr. Castillo, is of no benefit
to appellants.  Packard, --- S.W.3d ---, 2008 WL 516560 at *13.

We overrule appellants= issues arguing
the trial court abused its discretion based on the fact each of appellees= expert reports do
not address every appellant.

 








V.      Are
Appellees= Expert Reports Deficient Because
They Do Not Adequately Address The Standard Of Care And Causation?

Appellants contend appellees= expert reports
are deficient on the issues of the standard of care[5]
and causation because they are conclusory and do not specifically address each
appellant.  Because Dr. Edlich is qualified to render an opinion as to the
liability of each appellant, for reasons of judicial economy, we initially
focus our analysis on his report and will only examine the sufficiency of the
remaining expert reports if we determine Dr. Edlich=s report is
deficient on the issues of the standard of care and causation.

A.      Is Dr.
Edlich=s Expert Report
Deficient?

The physician appellants generally assert Dr. Edlich=s expert report is
conclusory because it lacks sufficient specific factual detail to adequately
apprise appellants of the basis of appellees= claims against
them as to the standard of care.[6] 
With regard to causation, appellants complain appellees= expert reports
are deficient because they only collectively address causation and fail to link
their causation opinions to specific facts thus rendering them conclusory.













Dr. Edlich filed a twenty-six page report detailing his
opinions regarding the care and treatment Ms. Rendon received from appellants.  Dr.
Edlich stated that, in the preparation of his report, he reviewed Ms. Rendon=s death
certificate, Ms. Rendon=s autopsy reports, and medical records
from Houston Northwest, Dr. Kelly, and Kelsey Seybold Clinic, Willowbrook.  Dr.
Edlich=s report contains
a section titled ASummary of Facts@ that details,
almost hour by hour, the events underlying this lawsuit beginning with Ms.
Rendon=s initial
consultation with Dr. Kelly, continuing through the tummy tuck procedure, her
post-surgical care, and concluding with her death less than five days after the
surgery.  This summary includes Ms. Rendon=s condition
throughout that time period.[7] 
Dr. Edlich then lists multiple standards of care for diagnosing and treating
patients demonstrating symptoms like Ms. Rendon=s.[8] 
Dr. Edlich then embarks on a detailed explanation of how each appellant
violated the required standard of care.[9] 
In the final section of his report, Dr. Edlich addresses causation.  In the
causation section, Dr. Edlich begins by generally stating that, as a result of
their deviations from the standard of care, each individually named appellant
caused Ms. Rendon=s death.  Dr. Edlich then provides a more
detailed analysis explaining how each separate appellant=s violations of
the standard of care caused Ms. Rendon=s death.[10]


















The two-fold purpose of an expert report under section
74.351 is to inform the defendants of the specific conduct the plaintiff has
called into question, and to provide the trial court with a basis to determine
whether or not the plaintiff=s claims have merit.  Patel v. Williams,
237 S.W.3d 901, 906 (Tex. App.CHouston [14th Dist.] 2007, no pet.). 
Pursuant to this standard, we conclude Dr. Edlich=s report is not
deficient as it addresses the standard of care in sufficient detail to apprise
each appellant of appellees= complaints regarding their alleged
violations of the standard of care.  Further, we conclude, with regard to his
causation opinions, Dr. Edlich=s report specifically addresses each
appellant and links his causation opinions to specific facts such that each
appellant had notice of the complaints against them.  Therefore, keeping in
mind that expert reports, such as that of Dr. Edlich, are simply a preliminary
method to show a plaintiff has a viable cause of action that is not frivolous
or without expert support, we hold the trial court did not abuse its discretion
when it denied appellants= motions to dismiss based on their
complaints that appellees= expert reports were deficient as to the
standard of care and causation elements.[11] 
Id.  Because we have determined Dr. Edlich=s report meets the
statutory requirements as to each appellant, we need not address appellants= complaints
regarding the other expert reports filed by appellees on the issues of the
standard of care and causation.  Tex. R. App. P. 47.1.

We overrule appellants= issues asserting
the trial court abused its discretion when it denied appellants= motions to
dismiss because appellees= expert reports are deficient as to the
standard of care and causation.

VI.      Were
Appellees= Expert Reports Deficient Because
They Did Not Address Each Autopsy Report Prepared By Dr. Chen?

Houston Northwest complains appellees= expert reports
are deficient because they do not address the causes of death found in each of
the three autopsy reports drafted by Dr. Chen, the pathologist who conducted
Ms. Rendon=s autopsy.

Dr. Chen conducted an autopsy of Ms. Rendon on November 7,
2004.  Subsequent to the actual autopsy, Dr. Chen issued three reports on his
findings as a result of that autopsy.  His provisional report was issued the
same day the autopsy was conducted.  In his provisional report, Dr. Chen opined
Ms. Rendon died as the result of multiple occlusive pulmonary thromboemboli. 
Dr. Chen=s final report was
issued on January 19, 2005.  In that report, Dr. Chen gave the cause of Ms.
Rendon=s death as lethal
levels of ephedrine.  However, despite the classification of the January 19,
2005 report as his final report, Dr. Chen issued a supplemental report on
September 14, 2006.  In his September 14, 2006 report, Dr. Chen states the
reason he issued the supplemental report was to Arender the final
cause of death as complications from necrotizing fasciitis.@








Houston Northwest argues appellees= expert reports
are deficient because they did not  address each of Dr. Chen=s reports and each
of his conclusions as to the cause of Ms. Rendon=s death.  Here,
Dr. Chen issued a supplemental report in which he rendered his final opinion
that Ms. Rendon=s death was caused by complications from
necrotizing fasciitis.  Each of appellees= physician experts
noted they reviewed Dr. Chen=s autopsy reports in the preparation of
their opinions and addressed necrotizing fasciitis as the cause of Ms. Rendon=s death.  Houston
Northwest does not cite any legal authority that requires an expert, in a
section 74.351 preliminary report, to specifically address every autopsy report
found in the medical records, particularly reports that have been supplanted by
later reports.  Because appellees= experts reviewed
Dr. Chen=s autopsy reports
in the preparation of their opinions in this case and addressed the final cause
of death, necrotizing fasciitis, we hold the reports  meet the statutory
requirements.  We overrule Houston Northwest=s issue on appeal
based on the autopsy reports. 

VII.     Appellants
Are Not Entitled To An Award Of Their Attorney=s Fees and Costs

Dr. Annamaneni contends the trial court abused its
discretion when it did not award appellants their reasonable attorney=s fees and costs
pursuant to section 74.351(b)(1).  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(b)(1). 
Because we have determined the trial court did not abuse its discretion when it
denied appellants= motions to dismiss, appellants were not
entitled to their reasonable attorney=s fees and costs. 
We overrule Dr. Annamaneni=s issue on appeal contending appellants
were entitled to an award of their attorney=s fees and costs.

Conclusion

Having addressed and overruled all issues raised by
appellants in this appeal, we affirm the trial court=s order denying
each appellant=s motion to dismiss.

 

 

/s/      John
S. Anderson

Justice

 

Judgment rendered and Opinion filed
March 27, 2008.

Panel consists of Chief Justice Hedges and Justices
Anderson, and Boyce.









[1]  This is the original diagnosis leading to the tummy
tuck procedure.





[2]  In the same issue on appeal, Dr. Annamaneni also
challenges the qualifications of appellees=
two nurse experts to render expert opinions against him.  We address that
contention below in section III(B). 





[3]  Because Dr. Weinberg addresses only Dr. Kelly=s treatment of Ms. Rendon and does not name Dr.
Annamaneni in his expert report, his opinions cannot be used against Dr.
Annamaneni.  Therefore, we need not reach the issue of whether Dr. Weinberg is
qualified to render an opinion against Dr. Annamaneni.





[4]  The fact we agree with appellants that Nurse
Shumaker=s report, standing alone, cannot address the issue of
medical causation, does not change our holding overruling appellants= issues challenging the  qualifications of appellees= experts because appellees filed adequate reports
which address medical causation in addition to the report of Nurse Shumaker.  See
Tex. Civ. Prac. & Rem. Code Ann. '
74.351(i) (stating there is no requirement that a health care liability
plaintiff file a single, all encompassing report).





[5]  Houston Northwest does not raise any standard of
care complaints on appeal.





[6]  In addition to a failure to state exactly what the
standard of care was and what each appellant should have done differently to
comply with that standard, examples of appellants= specificity complaints include: (1) a failure to specify which antibiotics
appellants should have ordered for Ms. Rendon; (2) the timing for the
administration of those antibiotics; (3) the exact time during Ms. Rendon=s hospitalization when her necrotizing fasciitis
became irreversible; and (4) morbidity and mortality rates for patients
similarly situated to Ms. Rendon.  Appellants do not cite any authority in
support of their position that a section 74.351 report requires the type of
extreme detail listed above to give defendants notice of the basis of the
claims against them and we are not persuaded the statute dictates such a level
of detail.  Accordingly, we reject appellants= request to require that level of detail in a section 74.351 expert
report.





[7]  As an example of the level of detail found in Dr.
Edlich=s report, we include a small excerpt here:

 

On post op
day # 2 (11/03/04), Ms. Rendon=s condition
severely worsened.  At midnight, she continued to have fever of 101.9, followed
by nausea and vomiting at 0045, dark concentrated urine with increased burning
abdominal pain noted at 0215, and decreased oxygen saturation of 94% at 0400
with further decrease to 93% at 0500.  At 0645, the nurse assessed that Ms.
Rendon=s lungs were congested and her urine continued to be
dark and concentrated.  The patient complained of weakness.  At 0800, Ms.
Rendon had further temperature elevation of 101.4 with increased tenderness of
the abdomen and declining blood pressure of 100/50.  No telephone call was made
to Dr. Kelly by the nurses to report Ms. Rendon=s deteriorating condition.  Finally, at 1000 on 11/03/04, Dr. Kelly saw
Ms. Rendon and documented that her continued fever was caused by her getting
out of bed.  Dr. Kelly wrote, ATemp spike to
101 after she got up.  This is commonly seen when pts get up.@  Dr. Kelly ordered no diagnostic tests, but merely
discontinued the Tylenol # 3, started Vicodin for pain, and Keflex antibiotic
therapy. 





[8]  We include an example of one of the standards of
care listed by Dr. Edlich:

 

Standard of Care requires that postoperatively patients
be assessed for signs and symptoms of infection to ensure early diagnosis and
appropriate treatment.  Success of treatment of necrotizing fasciitis depends
upon this assessment and early treatment of this condition.

 

[1.]       The most common presenting symptom of
necrotizing fasciitis is pain out of proportion to the local inflammatory
response noted by the patient.

[2.]       The patient must be closely monitored for
signs and symptoms of infection, including fever, elevated white blood cell
count, pain out of proportion to the operative procedure, lethargy, quickly
spreading erythema of the wound, and progressive anesthesia at the site of
infection.

[3.]       Early clinical diagnosis of group A Strep
necrotizing infection can be made by taking a careful history of the patient
and performing an MRI with aspiration biopsy.

[4.]       For patients with symptoms of necrotizing fasciitis, the
standard of care mandates that the wound site be immediately assessed as the
possible site for infection.





[9]  We include an example of a specific violation of the
standard of care as it applies to Dr. Kelly:

 

Dr. Kelly breached the standard of care when he failed
to adequately assess Ms. Rendon on the night of 11/02/04 when she developed
fever of 101.3 at 2115.  Standard of care requires prompt assessment, work-up,
and treatment of a post surgical patient who develops this type of elevated
temp within the first post op day.

 

[1.]       Upon a report of this high of fever on post
op day #1, standard of care required that Dr. Kelly go to the hospital
immediately to assess Ms. Rendon=s
condition and her post op wound, order diagnostic lab tests, order intravenous
empiric broad spectrum antibiotic therapy, perform an MRI and/or CT scan for
evaluation of the abdomen, and, if infection were found, take Ms. Rendon back
to surgery for debridement and drainage of the wound.

[2.]       Instead, Dr. Kelly merely ordered Tylenol per phone order. 
He did not order any tests or IV antibiotic therapy, and he did not return to
the hospital to assess Ms. Rendon.





[10]  Dr. Edlich=s
causation opinion as to Dr. Kelly is quoted here in its entirety:

 

Dr. Kelly failed to properly assess the condition of
Yolanda Leal Rendon prior to performing surgery on 11/02/04.  Dr. Kelly used
surgical techniques that increased Ms. Rendon=s risk for acquiring an infection at Houston Northwest Medical Center,
including use of inadequate preoperative scrub, improper use of hospital
equipment, lack of appropriate pre-operative antibiotic therapy and improper
closure of the surgical wound.  Dr. Kelly then delayed in assessment of Ms.
Rendon=s condition on 11/02/04, one day after surgery, when
she developed a high fever.  He did not order diagnostic tests on 11/02/04 to
determine the cause of her elevated temperature, which was an indicator of
Strep A infection in a postoperative patient less than 24 hrs after surgery. 
By 11/03/2004, Dr. Kelly again failed to recognize the rapidly deteriorating
condition of Ms. Rendon with signs and symptoms of elevated white blood cell
count, critical levels of bands in the CBC (left shift indicating bacterial
infection), lethargy, decreased urine output, and critically low blood
pressure.  Dr. Kelly did not appropriately treat this condition, perform the
proper diagnostic tests for determination of causation of the infection, refer
Ms. Rendon in a timely manner to a surgeon for consultation, nor did he take
Ms. Rendon back for exploratory surgery.  In addition, on 11/04/2004, when Ms.
Rendon=s only hope for survival was to be taken back to
surgery for exploration and debridement of the postoperative abdominal wound
along with administration of aggressive antibiotic therapy, Dr. Kelly merely
aspirated fluid near the incision cite, without use of an MRI, and sent the
specimen to the lab for testing.

 

Research supports that the most important predictor of
morbidity and mortality in this severe life threatening infection is the time
interval between the onset of symptoms and definitive surgical therapy. 
Necrotizing fasciitis is a progressive, rapidly spreading inflammatory
infection located in the deep fascia, causing secondary necrosis of the
subcutaneous tissues.  For treatment of necrotizing fasciitis to be successful,
this condition must be diagnosed early on with administration of broad-spectrum
antibiotics and rapid surgical debridement of the involved area.  Once
necrotizing fasciitis is suspected as being present, the patient should be
immediately taken to the operating room to open up the surgical wound and
debride the infected tissue.

 

Dr. Kelly should have been alert to the methods to diagnose serious
surgical wound infections, like necrotizing fasciitis, which include: a
diagnostic incision to search for infection, ultrasound of the wound, as well
as an MRI of the wound.  If Dr. Kelly had ordered an MRI exam as early as
11/02/04, he would have diagnosed the abdominal infection of Ms. Rendon.  With
early diagnosis of this infection, Ms. Rendon could have received appropriate
therapy, which would have saved her life.  The MRI would have permitted the
visualization of soft tissue edema in the fascial planes of the abdomen for
localization of necrotic tissue and fluid accumulation.  With this early
diagnosis of suspected Group A infection, Ms. Rendon could have received
immediate appropriate treatment, including antibiotic therapy, surgical
debridement of the wound with excision of devitalized tissue, bacteriologic
analysis of the wound, and appropriate antibiotic therapy followed by open wound
management.   





[11]  Appellants cite a litany of cases they contend
support their contention that appellees=
expert reports are deficient in their standard of care and causation opinions. 
We disagree as all of the cases can be distinguished from the present case. 
Most can be distinguished because, unlike the present case where the trial
court denied appellants= motions to dismiss, the trial court in the cited
cases granted the defendants= motions to
dismiss and the appellate courts found the trial court=s dismissal of the plaintiff=s claims for deficient expert reports was within the
trial court=s discretion.  See Bowie Mem=l Hosp. v. Wright, 79 S.W.3d 48 (Tex. 2002) (affirming trial court=s dismissal of plaintiff=s claims); Am. Transitional Care Ctr. of Tex., Inc. v. Palacios,
46 S.W.3d 873 (Tex. 2001) (same); Apodaca v. Russo, 228 S.W.3d 252 (Tex.
App.CAustin 2007, no pet.) (same); Talmore v. Baptist
Hosp. of Southeast Tex. d/b/a Mem=l Hermann Hosp., No.
09-06-024-CV, 2006 WL 2883124 (Tex. App.CBeaumont
Oct. 12, 2006, no pet.) (mem. op.) (same);  Lopez v. Sinha, No.
14-05-00606-CV, 2006 WL 2669355 (Tex. App.CHouston
[14th Dist.] Sept. 19, 2006, no pet.) (mem. op.) (same);  Clark v. HCA, Inc.,
210 S.W.3d 1 (Tex. App.CAmarillo 2005, no pet.) (same);  Gray v. CHCA
Bayshore, L.P., 189 S.W.3d 855 (Tex. App.CHouston [1st Dist.] 2006, no pet.) (same);  Longino v. Crosswhite,
183 S.W.3d 913 (Tex. App.CTexarkana 2006, no pet.) (same);  Hardy v. Marsh,
170 S.W.3d 865 (Tex. App.CTexarkana 2005, no pet.) (same);  Taylor v.
Christus Spohn Health Sys. Corp., 169 S.W.3d 241 (Tex. App.CCorpus Christi 2004, no pet.) (same);  Costello v.
Christus Santa Rosa Health Care Corp., 141 S.W.3d 245 (Tex. App.CSan Antonio 2004, no pet.) (same);  Russ v. Titus
Hosp. Dist., 128 S.W.3d 332 (Tex. App.CTexarkana
2004, pet. denied) (same);  Hawkins v. Gomez, No. 01-02-01195-CV, 2004
WL 306077 (Tex. App.CHouston [1st Dist.] Feb. 19, 2004, no pet.) (mem. op.)
(same);  Strom v. Mem=l
Hermann Hosp. Sys., 110 S.W.3d 216
(Tex. App.CHouston [1st Dist.] 2003, pet. denied) (same);  Villa
v. Hargrove, 110 S.W.3d 74 (Tex. App.CSan
Antonio 2003, pet. denied) (same);  Kirksey v. Marupudi, No.
07-03-0076-CV, 2003 WL 23096028 (Tex. App.CAmarillo
Dec. 30, 2003, no pet.) (mem. op.) (same);  Leston v. Cwikla, No.
05-02-01712-CV, 2003 WL 22332371 (Tex. App.CDallas
Oct. 14, 2003, rule 53.7(f) motion granted)(mem. op.) (same);  Shaw v. BMW
Healthcare, Inc., 100 S.W.3d 8 (Tex. App.CTyler 2002, pet. denied) (same);  Nichols v. Nacadoches Hosp. Dist.,
96 S.W.3d 582 (Tex. App.CTyler 2002, no pet.) (same);  De Leon v. Vela,
70 S.W.3d 194 (Tex. App.CSan Antonio 2001, pet. denied) (same);  Rittmer v.
Garza, 65 S.W.3d 718 (Tex. App.CHouston
[14th Dist.] 2001, no pet.) (same);  Hightower v. Saxton, 54 S.W.3d 380
(Tex. App.CWaco 2001, no pet.) (same).  The remaining cases cited
by appellants can be factually distinguished.  See CHCA Mainland, L.P. v.
Burkhalter, 227 S.W.3d 221 (Tex. App.CHouston
[1st Dist.] 2007, no pet.) (appellate court reversed holding the trial court
abused its discretion when it denied defendant=s motion to dismiss because the plaintiff=s expert reports completely failed to address the hospital defendant=s standard of care or the breaches of those
standards);  Wells v. Ashmore, 202 S.W.3d 465 (Tex. App.CAmarillo 2006, no pet.) (appellate court reversed
holding the trial court abused its discretion when it denied defendant=s motion to dismiss because the plaintiff=s expert reports failed to include any facts
connecting the expert=s conclusions with the breaches of the standard of
care);  Methodist Health Care Sys. of San Antonio, Ltd. v. Martinez-Partido,
No. 04-05-00868-CV, 2006 WL 1627844 (Tex. App.CSan Antonio June 14, 2006, pet. denied) (appellate court reversed
holding the trial court abused its discretion when it denied defendant=s motion to dismiss because the plaintiff=s experts were not qualified).