**Mansour SANJAR, M.D., and Ted W. Krell, M.D., Appellants,**

v.

**Augustine TURNER, Lionel Coleman, Sr., Ronniqua D. Coleman, and Laporscha Coleman, as Heirs and Representatives of the Estate of Karen Yvette Green, Appellees.**

No. 14–07–00545–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 19, 2008.

Mary Kathleen Evans, William J. Sharp, Frank N. Luccia, Houston, for appellants.

Charles Michael Hessel, Waller, Dwight Willis Scott, Jr., Richard M. Law, Houston, for appellees.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

## OPINION

LESLIE B. YATES, Justice.

This appeal pertains to a health care liability suit brought by appellees, Augustine Turner, Lionel Coleman, Sr., Ronniqua D. Coleman, and Laporscha Coleman, as heirs and representatives of the estate of Karen Yvette Green (collectively "the Colemans"), against appellants Mansour Sanjar, M.D. and Ted Krell, M.D. (collectively "the doctors"). The doctors contend in this interlocutory appeal that the trial court erred in denying their motions to dismiss because the Colemans' expert report is deficient. Specifically, they claim the expert was not qualified to render an opinion and the expert report was cumulative, vague, and conclusory as to the standard of care and causation. We disagree and affirm the trial court's judgment.

## I. BACKGROUND

On December 2, 2004, Karen Yvette Green entered the psychiatric unit of San Jacinto Methodist Hospital for suicidal ideation under the care of Mansour Sanjar, M.D. Green's medical history included, among other conditions, bronchial asthma and lower back pain. As part of the suicide watch, the nursing staff monitored Green every fifteen minutes.

On December 5, Green experienced back pain. Dr. Ted Krell saw her and prescribed hydrocodone. Between December 5 and 7, Green developed swelling in her legs (edema). Dr. Jeb Johnson was notified of the edema on December 7, at which time he also prescribed 50 mcg of fentanyl for Green's back pain. Green's other sedative psychiatric medications, such as Seroquel, were continued.

Over the next five days, Green continued to gain weight due to the edema in her legs. Dr. Johnson, Dr. Krell, and Dr. Sanjar each examined her at some point during this period. Dr. Sanjar added the sedative Haldol to Green's medications. By December 11, Green had gained over twenty pounds, had developed wheezing and shortness of breath, and had become increasingly lethargic. Dr. Beth Choby examined Green on Saturday afternoon, December 11, noted Green had oral thrush, and stated she would see Green again on Monday. The hospital nursing staff noted that Green's increasing lethargy and sleepiness were likely related to the medications.

At 2:00 a.m. on December 12, 2004, Green complained of indigestion. At 6:45 a.m. she developed cardiac arrest and could not be resuscitated. The autopsy report showed Green had hypertensive

cardiovascular disease, increased size of the heart, bronchial asthma, fluid in the lungs, and congestion of the liver. The medical examiner concluded that the combined toxicity of fentanyl and Seroquel caused Green's death.

The Colemans sued San Jacinto Methodist Hospital, Dr. Sanjar, Dr. Krell, Dr. Johnson, and Dr. Choby,[1] alleging that the hospital and doctors failed to (1) properly evaluate, diagnose, monitor, and treat Green's edema, (2) properly monitor Green while she was on sedative psychiatric medication, (3) properly monitor and treat Green's adverse respiratory conditions, and (4) properly monitor Green's vital signs as part of the suicide watch. The Colemans claimed that negligence by the hospital and the four doctors caused Green's death.

Pursuant to Texas Civil Practice and Remedies Code section 74.351, the Colemans filed an expert report by Eric Hoffman, M.D., a board certified physician of internal medicine. Dr. Sanjar and Dr. Krell objected to Hoffman's expert report and each filed motions to dismiss, which the trial court denied after conducting a hearing. On appeal, Dr. Sanjar and Dr. Krell contend in their first issue that the trial court abused its discretion by requiring them to provide extrinsic evidence regarding their objections to the adequacy of the expert report. The doctors argue in their second issue that the trial court erred because as an internist, Hoffman is not qualified to render an expert opinion on the standard of care applicable to them as psychiatrists. Dr. Krell further claims in his third and fourth issues that the trial court erred because the report fails to segregate the defendants and Hoffman's opinions on the standard of care and causation are conclusory.

---

1. San Jacinto Methodist Hospital and Drs. Johnson and Choby are not parties to this appeal.

## II. STANDARD OF REVIEW

 We review a trial court's ruling as to the adequacy of an expert report under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). Though we may not substitute our judgment for that of the trial court in reviewing factual matters or matters committed solely to the trial court's discretion, the trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992). Thus, a trial court's failure to apply or analyze the law correctly is an abuse of discretion. *Id.* at 840.

## III. HOFFMAN'S QUALIFICATIONS

 Section 74.351 of the Texas Civil Practice and Remedies Code requires that health care liability claimants provide an expert report to the defendants no later than 120 days after filing the original petition. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2007). A defendant may then file a motion challenging the adequacy of the report, and the trial court "shall grant" the motion if it appears that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *Id.* § 74.351(a), (*l*). The statute defines an expert report as a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable standard of care, the manner in which that standard was breached, and the causal relationship

between that breach and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6). To qualify as an expert on whether the defendant physician departed from the standard of medical care, the expert's report and curriculum vitae must demonstrate that the expert is a physician who was practicing medicine at the time the claim arose, has knowledge of accepted standards of medical care for the diagnosis, cure, or treatment of the illness, injury or condition involved in the claim, and is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards. *Id.* § 74.401(a) (Vernon 2005). In determining whether a physician is qualified on the basis of training or experience, the court shall consider whether the physician is board certified or has other substantial training in an area of medical practice relevant to the claim and is actively practicing medicine in rendering medical care services relevant to the claim. *Id.* § 74.401(c). The trial court's inquiry is limited to the four corners of the report. *Palacios,* 46 S.W.3d at 878.

Hoffman asserts in his report that he is qualified on the basis of his training and experience to offer an opinion regarding the treatment of Green's edema, respiratory distress, and back pain. Hoffman's report and curriculum vitae reflect that he is board certified in internal medicine, has been practicing medicine for over twenty years, is familiar with the standard of care for asthmatic bronchitis, back pain, edema of the leg, congestive heart failure, and suicide watches, and is familiar with interpreting how autopsy results relate to the medical diagnosis during a patient's life. Dr. Hoffman states that he formed his opinions in this case from a review of Green's medical records, the autopsy report, his years of experience, his knowledge accumulated as chairman of a medical records committee, and medical literature.

In their second issue, Sanjar and Krell contend the trial court erred in denying their motions to dismiss because Hoffman's report fails to establish that he is qualified to render an opinion about the standard of care applicable to them in their roles as Green's psychiatrists. The doctors argue that the "accepted standards of medical care" language in section 74.401(a)(2) should be developed with respect to the medical specialty in question, and therefore Hoffman must demonstrate knowledge of what the standard of care requires of a psychiatrist when presented with circumstances similar to Green's condition. We disagree.

Dr. Hoffman concluded in his report that an overdose of fentanyl decreased Green's respirations, and that the failure to properly monitor Green in conjunction with her decreased respirations led to her inability to breathe after she aspirated and resulted in her cardiac arrest and death. Hoffman further concluded that the failure to correctly diagnose the cause of Green's edema, cardiomyopathy, and bronchial asthma contributed to her death. Hoffman's report and curriculum vitae demonstrate that he is qualified to opine on the standard of care applicable to physicians monitoring and treating edema, prescribing fentanyl for back pain, and monitoring respiratory distress. Hoffman's report also provides evidence that in caring for Green, Sanjar and Krell acted, at least to some extent, in their capacity as medical doctors. The report states that Sanjar took Green's medical history of bronchial asthma and back pain upon her admission to the hospital. Sanjar also prescribed Haldol, which has sedative properties, for Green. Krell prescribed hydrocodone for Green's back pain. Both doctors independently examined Green at some point during the five days leading up to her death, the time frame when her edema, lethargy, and respiratory problems continued to

worsen. We therefore conclude Hoffman was qualified to render an expert opinion on the standard of care applicable to Sanjar and Krell with respect to their participation in the treatment of Green's edema, the administration of fentanyl, and the monitoring of her increasing lethargy and respiratory difficulties.[2] *See In re Stacy K. Boone, P.A.*, 223 S.W.3d 398, 407 (Tex. App.—Amarillo 2006, no pet.) (holding cardiologist was qualified to render expert opinion as to general surgeon's care because opinion was on post-operative therapy and surgeon participated in management of that therapy); *see also Broders v. Heise*, 924 S.W.2d 148, 153–54 (Tex.1996) (holding medical expert must have sufficient expertise with regard to actual subject because not every doctor is a qualified expert on every medical question). Accordingly, we conclude the trial court did not abuse its discretion in denying the motions to dismiss on grounds that Hoffman was not qualified to render an expert opinion as to Sanjar and Krell. We overrule the doctors' second issue.

## IV. SUFFICIENCY OF HOFFMAN'S REPORT

Krell argues in his third and fourth issues that the trial court erred in denying his motion to dismiss because Hoffman's report impermissibly groups all the defendant doctors under a single standard of care and is conclusory as to causation. We disagree and conclude the trial court could have found that the report meets the statutory requirements.

■■■ When considering a motion to dismiss under section 74.351, "the issue for the trial court is whether the report represents a good faith effort to comply with the statutory definition of an expert report." *Palacios*, 46 S.W.3d at 878. To constitute a "good faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002). When a plaintiff sues more than one defendant, the expert report must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), (r)(6). Identifying the correct standard of care is essential because the trial court cannot determine whether each doctor breached its duty without specific information about what that particular doctor should have done

2. In their first issue, Sanjar and Krell contend the trial court failed to limit its review to the four corners of the report by requiring them to produce evidence of their medical specialty. As evidence of this, the doctors point to the trial court's questions regarding evidence in the record that would establish their roles as psychiatrists, as well as the court's statement, "I just don't read Chapter 74 as you suggest it should be read where you have absolutely no evidentiary burden." We disagree with the doctors' interpretation that these statements amounted to the trial court's going beyond the four corners of the expert report. However, even if it were error, we have determined that Hoffman was qualified

to opine on Green's medical care, and that Sanjar and Krell participated in that medical care. Therefore, regardless of whether the trial court's comments could be interpreted as requiring Sanjar and Krell to put forth evidence, the trial court could still have properly concluded, based on Hoffman's report and curriculum vitae, that Hoffman was qualified to render an expert opinion on the medical issues relevant to the claim. *See Donalson v. Barr*, 86 S.W.3d 718, 720 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding that appellate court must affirm when trial court reaches the right result, but for the wrong reasons). The doctors' first issue is overruled.

differently. *See Palacios,* 46 S.W.3d at 880.

In his report, Hoffman gives his opinion on three areas—edema, fentanyl medication, and suicide watch. With regard to Green's edema, Hoffman lists all the defendants by name and gives a detailed description of the standard of care for diagnosing and treating edema. He explains what the doctors should have done but failed to do,[3] how this affected Green's medical condition,[4] and that the failure to deliver the standard of care was a proximate cause of Green's death. Regarding the fentanyl medication, Hoffman states the standard of care for the prescribing physician (Johnson), then cites all four defendant doctors by name for their failure to properly prescribe and monitor the use of fentanyl. Hoffman describes how the fentanyl overdose caused depression of Green's respirations and concludes that the failure to monitor Green was a proximate cause of her death after she aspirated. Finally, Hoffman states the standard of care for the "physicians, nurses and hospital staff" monitoring a patient on suicide watch and cites all the defendants by name for failing to properly monitor Green on the suicide watch. Hoffman states that the failure to monitor contributed to Green's deteriorating respiratory status and was a proximate cause of her death. In his final summary, Hoffman concludes:

> Dr. Sanjar, Dr. [Johnson], Dr. Krell and Dr. Choby fell below the standard of care in prescribing a larger than required dose of [fentanyl] and that this

led to the subsequent exacerbation of breathing problems in relationship to the patient's asthma problems and congestion and that this was a proximate cause of the death and this fell below the standard of care as outlined above and was therefore negligent.

 According to Hoffman's report, all the defendant doctors participated in treating Green's edema, monitoring her fentanyl medication, and monitoring her respiratory distress. Hoffman's report sets out the standard of care applicable to Green's treating physicians by name and describes in detail the care Green should have received from them. We therefore conclude that grouping the defendant doctors together under the relevant standard of care for each condition does not render Hoffman's report inadequate. *See Romero v. Lieberman,* 232 S.W.3d 385, 391–92 (Tex.App.-Dallas 2007, no pet.) (concluding "one size fits all" standard of care was sufficient because all three doctors participated in treating patient's condition); *Boone,* 223 S.W.3d at 405–06 (holding single standard of care applied to defendant doctors and physician's assistant sufficient because all were involved in administering treatment).

Krell cites several cases in support of his argument that an expert report naming multiple defendants but applying the same standard of care to all fails to meet the statutory requirements. *See Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 246 (Tex.App.-Corpus Christi

---

**3.** The report states, "What should have been done is that the patient should have had an evaluation which included a chest x-ray, pulse oximetry and/or echocardiography which would well have established the congestion related to both asthma and congestive cardiomegaly which was found at autopsy."

**4.** The report states:

The known consequences of a failure to provide the above listed care by Dr. Sanjar, Dr. Krell, Dr. [Johnson], and Dr. Choby to Karen Green includes the development of increasing congestion and the development of life threatening situations .... the standard of care was breached and the patient, Karen Green, developed cardiomegaly and exacerbation of her bronchial asthma with marked congestion of the lungs.

2004, no pet.); *Eichelberger v. St. Paul Med. Ctr.*, 99 S.W.3d 636, 639 (Tex.App.-Dallas 2003, pet. denied); *Doades v. Syed*, 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Whitworth v. Blumenthal*, 59 S.W.3d 393, 396 (Tex.App.-Dallas 2001, pet. dism'd by agr.); *Wood v. Tice*, 988 S.W.2d 829, 831–32 (Tex.App.-San Antonio 1999, pet. denied). Krell's reliance on these cases is misplaced. While *Taylor* does require that the expert report state a standard of care for each healthcare provider, nothing in *Taylor* explicitly forbids applying the same standard of care to more than one physician if, as in the present case, they all owed the same duty to the patient. *See Taylor*, 169 S.W.3d at 245–46. The expert reports in the other cases are distinguishable because they either failed to state a standard of care, failed to specifically name the defendant health care providers or failed to

recognize that the health care providers owed different duties to the patient.[5]

▮▮▮▮▮ We further conclude that Hoffman's report is not conclusory as to causation. Krell claims that Hoffman fails to explain how the cardiomegaly and heart congestion associated with Green's edema contributed to her death and fails to show a causal link between the administration of fentanyl, the decrease in Green's respiratory status, and her death. Krell claims that in light of his limited involvement as an on-call psychiatrist,[6] the report does not sufficiently explain what he did or failed to do, nor does it link any alleged deviations from the standard of care to any damages. We disagree. As discussed above, Hoffman indicates that all four physicians, Krell included, participated in caring for Green. Hoffman states what the doctors, Krell included, should have done to properly monitor and treat Green's conditions. He states that if she had received the proper care, in all likelihood she would have survived. Hoffman explains the basis for his

**5.** For example, in *Rittmer* this court found the expert report inadequate because it referred to the defendant physicians collectively and lacked specificity as to the standard of care applicable to the different portions of surgery performed by the individual doctors. 65 S.W.3d at 722–23. In contrast to the report in *Rittmer*, Hoffman's report assigns the same duty to all the defendant physicians to monitor, properly diagnose, and properly treat Green's edema and respiratory difficulties. *Doades* also involved a report that failed to state the standard of care for each defendant health care provider. 94 S.W.3d at 672. However, *Doades* is distinguishable because while Hoffman's report specifically states the standard of care and describes the specific measures the treating doctors failed to take when monitoring and treating Green's conditions, the *Doades* report wrapped the standard of care, breach, and causation into a general assertion that the treating doctor and nurse "[failed] to properly monitor Doades and . . . [failed] to timely identify and properly treat [his condition]," a statement the court deemed conclusory. *Id.* at 668, 671–72. The

remaining cases deal with reports that completely failed to name any of the defendant physicians. *See Eichelberger*, 99 S.W.3d at 639 (no mention of defendant health care providers by name); *Whitworth*, 59 S.W.3d at 396–97 (same); *Wood*, 988 S.W.2d at 831–32 (plaintiff's "expert report" consisted of portions of defendant doctor's deposition, did not include doctor's c.v., and did not mention any defendant physician by name).

**6.** Krell's argument regarding his limited role as an on-call, weekend psychiatrist amounts to a claim that he owed no duty to Green to recognize, monitor, and diagnose her deteriorating condition. This argument is more appropriately raised in a motion for summary judgment than a motion to dismiss under Chapter 74. *See Wissa v. Voosen*, 243 S.W.3d 165 (Tex.App.-San Antonio 2007, pet. filed) (physician's challenge to expert report on grounds that he owed no duty to patient outside his role as an anesthesiologist was properly raised in motion for summary judgment, not motion to dismiss).

statements and describes a causal link between Green's congestive heart condition, the depression of her respirations from over-medication, and the failure to adequately monitor her deteriorating condition. *See Bowie*, 79 S.W.3d at 52 (report must contain information linking expert's conclusions to alleged breach). While Hoffman's report could have been more specific as to exactly how Green's cardiomegaly and bronchial asthma caused her death, we cannot say that the trial court's conclusion that it was sufficient constitutes an abuse of discretion. *See Hillcrest Baptist Med. Ctr. v. Wade*, 172 S.W.3d 55, 60–61 (Tex.App.-Waco 2005, pet. dism'd by agr.) (holding that because trial court could have concluded that when considered together, expert reports contained statutory requirements, court did not abuse its discretion in denying defendant medical center's motion to dismiss). Further, an expert report need not marshal all the plaintiff's proof as long as it includes the expert's opinion on each of the elements identified in the statute. *See Palacios*, 46 S.W.3d at 878. Accordingly, we conclude Hoffman's report represents a good-faith effort to comply with the statutory definition of an expert report, and the trial court did not abuse its discretion in denying the motions to dismiss on this basis. *See Bowie*, 79 S.W.3d at 52. We overrule Krell's third and fourth issues.

## V. CONCLUSION

■ Based on our review of the Colemans' claims and the four corners of Hoffman's report, we conclude that Hoffman was qualified to issue an expert opinion on the standard of care applicable to the defendant physicians with respect to their treatment of Green's edema, fentanyl medication, and respiratory distress. We further conclude that Hoffman's report meets the two-part *Palacios* test because it informs Sanjar and Krell of the specific conduct the Colemans have called into question and provides sufficient information for the trial court to conclude the claims have merit. *See Palacios*, 46 S.W.3d at 879. We hold the trial court did not abuse its discretion in denying Sanjar's and Krell's motions to dismiss and therefore affirm the trial court's judgment.