**Shamji P. BADHIWALA, M.D., Appellant,**

**v.**

**LaWanda FAVORS, George Favors, Individually; LaWanda Favors, as Surviving Parent and Representative of the Estate of Kimberly Favors; and George Favors, as Surviving Parent and Representative of the Estate of Kimberly Favors, Appellees.**

**No. 05–10–00211–CV.**

Court of Appeals of Texas, Dallas.

May 4, 2011.

Russell G. Thornton, Stinnett Thiebaud & Remington, L.L.P., Dallas, TX, for Appellant.

Mohamad Said, Shahin Shamseddin Modjarrad, Modjarrad & Abusaad, P.C., Richardson, TX, for Appellees.

Before Justices MORRIS, MOSELEY, and MYERS.

## OPINION

Opinion By Justice MOSELEY.

The trial court overruled Shamji P. Badhiwala, M.D.'s objections to the expert reports filed by LaWanda and George Favors, individually and as surviving parents and representatives of the Estate of Kimberly Favors, and denied his motion to dismiss their health care liability claims. Badhiwala brings this interlocutory appeal, arguing in two issues that the Favorses failed to provide an expert report meeting the requirements of section 74.351 and he is entitled to dismissal. *See* TEX. CIV. PRAC. & REM CODE ANN. § 74.351 (West Supp. 2010). For the reasons that follow, we conclude the trial court abused its discretion by denying Badhiwala's objections to the Favorses' expert reports. We resolve Badhiwala's first issue in his favor. However, we resolve Badhiwala's second issue against him. We reverse the trial court's order and remand this case to the trial court for further proceedings.

## I. BACKGROUND

LaWanda and George Favors pleaded that Dallas police took Kimberly into custody after she caused a disturbance at a hotel. Subsequently, she was involuntarily committed and placed in the custody of the defendants at Green Oaks Hospital in the early afternoon on July 20, 2007.[1] The Favorses pleaded that Kimberly sought professional treatment from the defendants for psychotic episodes, including Bipolar Affective Disorder. They identified Howard Leftin, Robert Williamson, and Raza H. Sayed as medical doctors (psychiatrists) and Badhiwala as a registered nurse.

The Favorses alleged that, while in the defendants' care, Kimberly was not properly medicated, observed, and monitored, causing her death on July 22. They al-

---

1. The other defendants are: Green Oaks Hospital Subsidiary, L.P. d/b/a Green Oaks Hospital; HCA/Green Oaks Behavioral Healthcare Services Affiliates, Inc.; Frankie Hunter, Kindra Carrington, Kameshe Nobles; Howard Leftin; Karen S. Knowles; Robert Williamson; Raza H. Sayed; and Vicky W. Bates. They are not parties to this appeal.

leged claims for negligence and res ipsa loquitur, among other claims, against individual plaintiffs, including Badhiwala. Among the allegations of negligence was the failure to perform properly the medical treatment necessary to Kimberly's welfare according to the standards set by the nursing profession.

In his answer, Badhiwala identified himself as a medical doctor and denied liability.

About four months after filing suit, the Favorses filed expert reports and accompanying curriculum vitae: two from nurses; one from a non-physician psychologist; and two from physicians. Badhiwala objected to these reports and moved to dismiss the Favorses' claims on grounds that the reports did not meet the requirements of chapter 74. The Favorses responded to Badhiwala's motion, contending their reports were "sufficient and adequate" pursuant to chapter 74. Alternatively, they requested a thirty-day grace period to cure any deficiency.

The trial court overruled Badhiwala's objections and denied his motion to dismiss. This interlocutory appeal followed.

## II. STANDARD OF REVIEW

We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002) (per curiam). A trial court abuses its discretion when it clearly fails to analyze and determine the law correctly or applies the law incorrectly to the facts. *Petty v. Churner*, 310 S.W.3d 131, 134 (Tex.App.-Dallas 2010, no pet.).

## III. APPLICABLE LAW

Within 120 days of filing a health care liability claim, a plaintiff must serve an expert report with the expert's curriculum vitae on each defendant against whom a liability claim is asserted. TEX. CIV. PRAC. & REM CODE ANN. § 74.351(a). To sustain the suit, a report must be authored by an expert, as defined by subsection (r)(5), and contain the expert's opinion with regard to the standard of care, the manner in which the health care provider failed to meet that standard, and the causal relationship between that failure and the plaintiff's injury. *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex.2008) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)-(6)).

"A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report...." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l*). To constitute a good faith effort, an expert report must: (1) inform the defendant of the specific conduct the claimant is questioning, and (2) "provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879; *see In re Buster*, 275 S.W.3d 475, 476-77 (Tex.2008) (orig. proceeding) (per curiam); *Leland*, 257 S.W.3d at 206-07. The report cannot merely state the expert's conclusions about these elements but must explain the basis of the statements, linking the conclusions to the facts. *Petty*, 310 S.W.3d at 134 (citing *Bowie Mem'l Hosp.*, 79 S.W.3d at 52). In determining a report's sufficiency, the court may not look beyond the report itself because all information relevant to the inquiry should be contained within the document's four corners. *Id.*

If, as to a defendant physician or health care provider, an expert report has not been served within the period specified in subsection (a), the court, on the motion of the affected defendant shall, subject to subsection (c), enter an order awarding the affected defendant reasonable attorney's fees and costs of court incurred by that defendant and dismisses the claim with respect to that defendant with prejudice to refiling the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). If a report has not been served within the subsection (a) time period because elements of the report are found deficient, the court may grant one thirty-day extension to the claimant in order to cure the deficiency. *Id.* § 74.351(c). If the court determines that the report is adequate, the defendant may challenge that ruling by interlocutory appeal. *Leland,* 257 S.W.3d at 207 (citing TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2008)).

## IV. DISCUSSION

### A. Adequacy of the Expert Reports

In his first issue, Badhiwala contends the Favorses failed to provide an expert report from a qualified expert that established the statutorily required elements.

#### 1. Non-physicians' reports

■ The Favorses filed reports and curriculum vitae from two nurses, Susan Butkiewicz, R.N., B.S.N., and Rick D. Castro, R.N., B.S.N., and a doctor of philosophy and licensed psychologist, Myrna V. Dartson, Ph.D. All three reports discuss a standard of care applicable to nurses.

In his objections and motion to dismiss, Badhiwala contended none of these individuals were qualified to address the statutory elements of the standard of care, breach, and causation. Attached to this pleading were copies of print-outs from the Texas Medical Board website identifying Badhiwala as a medical doctor with a speciality in psychiatry.

Section 74.351 defines "expert," meaning, with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of section 74.401. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(A). Section 74.401 provides that, in a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care "only if the person is a physician. . . ." *Id.* § 74.401 (West 2005). Pursuant to section 74.403, in a health care liability claim, only a physician may testify as an expert on the issue of causation. *Id.* § 74.403; *see Petty,* 310 S.W.3d at 135; *Walgreen Co. v. Hieger,* 243 S.W.3d 183, 186 n. 2 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

Because it is undisputed that Badhiwala is a medical doctor, not a nurse, all three of these reports are inadequate concerning the standard of care. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (report must provide a fair summary of the *applicable* standards of care). In addition, a "physician" is defined to include, as relevant here, those individuals licensed to practice medicine. *See Davis v. Webb,* 246 S.W.3d 768, 773 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (citing TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(23)). The record shows that Butkiewicz, Castro, and Dartson are not physicians because they are not licensed to practice medicine. *See id.* Therefore, their reports cannot be considered in determining the statutory elements of breach of the standard of care and causation. *See Petty,* 310 S.W.3d at 135; *Hieger,* 243 S.W.3d at 186 n. 2; *see also* TEX. CIV. PRAC. & REM.CODE ANN.

§ 74.351(i) (providing that expert reports may be considered together in determining whether plaintiff has provided adequate expert opinion regarding standard of care, breach and causation). Because we conclude the non-physicians did not qualify as experts under section 74.351, we resolve Badhiwala's first issue in his favor to this extent.

## 2. Physicians' reports

The Favorses filed reports and curriculum vitae from two physicians: George S. Glass, M.D., P.A.; and Charles D. Marable, M.D. In his objections and motion to dismiss, Badhiwala contended that these reports failed to set forth the standard of care applicable to him, how he breached it, and the causal connection between any negligent act or omission by him and Kimberly's injuries. He also argued that if these elements were addressed, any opinions were improper because they were conclusory.

### a. George S. Glass, M.D., P.A.

■ In his report, Glass states that he is a board certified psychiatrist and an addictionologist and had experience treating patients with an acute psychotic episode and side effects from psychiatric medications. He reviewed medical records from Green Oaks and Timberlawn Hospital (where Kimberly had been treated in July 2007, before being admitted to Green Oaks); he also reviewed medical records from Medical City Hospital and spoke to the coroner. In the "Review of Facts" section of his report, Glass described the following sequence of events relevant to Kimberly's treatment at Green Oaks, which we have grouped in numbered paragraphs and summarized in part and quoted selectively in part.[2]

(1) Kimberly was admitted at 3:20 p.m. on July 20. "It is noteworthy that she was not first evaluated in a medical hospital emergency room as she had been 10 days earlier [at Parkland Hospital], and on admission to Green Oaks she did not receive a history or physical." At 4:00 p.m., Badhiwala, identified as *"physician or nurse?"* gave her a psychiatric assessment and diagnosed her as *"Psychosis ... threatening violence"*; Badhiwala described her conduct before she was brought in and during the interview; Badhiwala noted, *"Required IM meds as soon as cuffs were removed and required seclusion[.]"* The only laboratory tests at admission were a pregnancy test and a Urine Drug Screen, and she was immediately medicated with specified doses of Haldol, Benadryl, Ativan 2, and Loxitane. She was charted as "off her bipolar meds for some time." An *"EDM assessment"* at admission gave her temperature (measured by defendant Karen Knowles), but "there is not a full history of physical on the chart, indicating that it was not done."

(2) At 5:30 p.m., Restraint/Seclusion Progress Notes stated Kimberly was given the medication Depakote and placed back in seclusion *"per order"*; she was seen again at 6:50 p.m. and discharged from seclusion.

(3) At 9:17 p.m., Sayed Raza, M.D.[3] noted he met with Kimberly and reviewed her chart; she *"appears drowsy from meds."* Raza noted she *"carries a diagnosis of Bipolar Disorder, wants to stay on lithium instead of Depakote[.]"* These notes say Kimberly was *"placed on"* specific doses of Lithium, Abilify, and Ferrous Sulfate. Glass stated, "The addition of these medicines brings the

---

**2.** Glass italicized quotations from the records he reviewed; we follow that format.

**3.** The petition states his name as "Raza H. Sayed."

total number of medications to 8 that she was placed on in 6 hours, with no serum Lithium level, laboratory tests, and no physical examination done on Ms. Favors by a physician since her admission."

(4) The following day, July 21, a case manager saw Kimberly at 10:18 a.m. and noted reports about her conduct.

(5) At 2:45 p.m., the records said, "*non-cooperative, intrusive with patients. Aggressive toward Staff. Pt. requiring quiet time, and Dr. notified and orders received for pt. to* [sic] *into Seclusion[.]*" At 3:15 p.m., Kimberly was "*instructed on medication*" for a specific dose of Zyprexa and Ativan "*lag im.*" At 3:20 p.m., Kimberly was discharged from seclusion.

(6) The next day, July 22, at midnight, Kimberly "*appeared to be drowsy and hard to arouse[.]*" At 3:15 a.m., she "*stumbled*" at the night desk and was assisted to a "*quiet room,*" where she got herself into bed. Glass stated, "Clearly, something was not right with Ms. Favors['] medical condition and mental state at this time, whether she was overmedicated, had a reaction to the medications, or had some form of medical or organic brain problem. This should have been an indication that Ms. Favors should have been medically re-evaluated, or at least had her vital signs checked by the staff."

(7) At 4:45 a.m., Kimberly could not be aroused, and she had no pulse. CPR was started, and a physician and 911 were called. Howard Leftin, M.D. (a defendant) answered the call and reviewed the case with staff.

(8) EMS took Kimberly to Medical City Hospital. The chart note there at 5:03 a.m. says she was pronounced dead and "*Primary Impression: Cardiac Arrest[.]*" In the autopsy report the coro-ner stated his opinion that the cause of death was "*sudden death following an acute psychotic episode[.]*" The autopsy also noted Lithium and dephenhydra-mine under "*Toxicology.*"

Glass stated, "The Standard of Care for a new patient admission to a Psychiatric facility requires a Medical Consultation and examination within 24 hours of admission." Specifically, he stated that the standard of care of a reasonable and prudent psychiatrist under the same or similar circumstances required these two acts, among others: "Full history, physical exam and laboratory work up on the admission of Kimberly Favors to the acute Psychiatric Unit at Green Oaks Hospital and to rule out treatable medical conditions that could cause or worsen the psychotic episode;" and "Baseline medical workup [sic] or consultation within 24 hours of admission[.]" Glass said Kimberly should have received a thorough medical evaluation, including history and physical, and routine laboratory tests, which were not done and which failure was below the standard of care. Glass opined that psychiatrists did not have the same level of expertise to evaluate and treat patients who are suffering from non-psychiatric medical conditions, and a consultation with an internist is required to treat such medical conditions.

Glass said Kimberly was given "large doses of a number of potent medications, and when she did not respond to a medication, it was immediately changed on multiple occasions for other potent and potentially toxic medications." And, although she was put in seclusion to manage her behavior, "she was apparently not closely monitored while in seclusion." Further,

No consideration was given that something else, such as an underlying medical problem or a reaction to the medication, such as NMS [Neuroleptic Malignant Syndrome], may have been

going on with her. She became increasingly confused, disoriented, hard to manage, and did not respond to the medication in the manner she should have. This lack of response to the medication was in all reasonable medical probability due to an interaction or side effect of the medication, rather than the Bipolar Disorder she was diagnosed with.

. . . . In all reasonable medical probability, her death would have been prevented if she had a thorough medical evaluation including laboratory tests at the time of her admission to Green Oaks, and if she had been more closely monitored while in seclusion.

Glass summed up the standard of care for psychiatrists: "to be aware of the possibility of underlying medical problems, and side effects of the medication including NMS as well as the need for emergency medical care should this condition arise." Referring to the "psychiatrists who participated in this hospitalization," he said all of them "should be held to the same standard of care."

The only reference to Badhiwala is in connection with Kimberly's admission and initial psychiatric diagnosis and prescription for medication. Glass tentatively identified Badhiwala as the first physician who saw her, but Glass did not fault the diagnosis of "psychosis" on Kimberly's admission," the initial prescriptions, or the initial seclusion, stating, "Patients with an acute psychotic attack . . . often require the use of medication and even the use of brief seclusion . . . to ensure safety of the patient and/or others." From the recitation of facts, Badhiwala properly diagnosed Kimberly's immediate mental condition, and Glass does not state that Badhiwala was responsible for ordering specific tests in addition to those conducted at Kimberly's admission or a physical examination.

Glass's statement of the standard of care regarding referral for a physical "on admission" and within twenty-four hours is too vague and conclusory to refer to Badhiwala. *See Mallat v. Reeves,* 238 S.W.3d 874, 880–81 (Tex.App.-Dallas 2007, no pet.) (discussing failure to distinguish individual physicians' responsibilities and conduct); *Kettle v. Baylor Med. Ctr. at Garland,* 232 S.W.3d 832, 838–39 (Tex.App.-Dallas 2007, pet. denied) (discussing physicians' collective duty to diagnose and treat patient's condition "promptly or earlier" as "too vague and general"); *Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex.App.-Corpus Christi 2004, no pet.) (discussing necessity of explaining how each defendant breached standard of care and such breach contributed to cause of injury in multiple-defendant cases). Glass states no facts connecting Badhiwala with subsequent medication decisions or prescriptions or with any subsequent deterioration in Kimberly's mental or physical condition. *See Mallat,* 238 S.W.3d at 880–81 (discussing inadequacy of report that discusses one physician's violation of standard of care in detail but fails to state how another physician's conduct was improper).

To the contrary, Glass faulted Leftin, Williamson, and Sayed by name for not consulting with an internist after admission to identify "medical problems" that might exist; prescribing subsequent medications; not monitoring Kimberly for side effects from the medications; and not recognizing impending respiratory collapse. Specifically as to them, Glass opined that the standard of care for a reasonable and prudent physician under the same or similar circumstances required a "[f]ull history, physical exam and laboratory work up on the admission of Kimberly" to Green Oaks "to rule out treatable medical conditions that could cause or worsen the psychotic episode" and a "[b]aseline internal medicine consul-

tation within 24 hours of admission." But Glass did not specifically refer to Badhiwala in connection with any of these acts or omissions at or subsequent to Kimberly's admission.

As to causation, Glass opined that Kimberly developed the "medical problem" of cardio respiratory failure due to the side effects of the antipsychotic therapy, leading to her death from cardio respiratory collapse. He described the following failures: to "avoid polypharmacy or a drug-cocktail" that can lead to "serious side effects including respiratory depression and cardiac arrest"; to "start treatment with a low dose of medication that is monitored closely for any side-effects"; to "evaluate the development of side-effects and to prescribe a lower dose, add a medication to reduce side-effects, or recommend a different medication; to recognize and treat an emergency, such as NMS, from a reaction to medicines."

■ Glass describes Kimberly's "deterioration" in the stages outlined above, but nothing in Glass's report connects any act or omission of Badhiwala to any post-admission stage of Kimberly's diagnosis, treatment, or monitoring. And nothing in his report connects any conduct by Badhiwala to cardio respiratory failure due to the side effects of the drugs she was prescribed at admission. *See Jernigan v. Langley*, 195 S.W.3d 91, 93–94 (Tex.2006) (per curiam) (discussing lack of specificity when report only made "passing reference" to physician's involvement in care without identifying his action or inaction; "perfunctory mention alleges no misconduct whatsoever"). Glass does not identify Badhiwala as a psychiatrist or include him in the opinions directed at the three named psychiatrists; a court is precluded from "filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart,*

*P.A. v. Webb,* 228 S.W.3d 276, 279, 280–81 (Tex.App.-Austin 2007, no pet.); *cf. Fagadau v. Wenkstern,* 311 S.W.3d 132, 138 (Tex.App.-Dallas 2010, no pet.) (report stated that physician should have referred eye patient to specialist or immediately scheduled a follow-up appointment within specified period of time, tying care to specific facts). Nor does it link any breach of a standard of care by Badhiwala to Kimberly's injuries. *Cf. Fagadau,* 311 S.W.3d at 138 (report specifically linked failure to examine properly or re-examine eye with specific injuries).

The Favorses rely on *Sanjar v. Turner,* 252 S.W.3d 460, 465–67 (Tex.App.-Houston [14th Dist.] 2008, no pet.), to support their argument that grouping defendants together under a single standard of care did not render Glass's report inadequate because Glass opined that the same standard was applicable to all and the report adequately stated how each physician individually failed to meet that standard. The expert in *Sanjar* listed all defendants by name and gave his opinion on how those defendants failed to meet standards of care in specific areas of treatment, stating they all participated in treating the patient. *See id.* In contrast, Badhiwala is not definitely identified as a medical doctor, and he is not specifically listed with the other psychiatrists in discussing their standard of care, how they breached it, and how such breach caused Kimberly's injuries.

Likewise, the Favorses' reliance on *Romero v. Lieberman,* 232 S.W.3d 385, 391–92 (Tex.App.-Dallas 2007, no pet.), is unavailing. There, three physicians participated in treating a patient, and the expert named each of them, detailed the patient's symptoms, and discussed the standard of care and how the conduct of each physician fell below that standard and caused the patient's injuries. That report

is distinguishable from Glass's report. Because Glass's report is conclusory by failing to state facts as to the statutory requirements concerning Badhiwala, it does not represent a good faith effort to comply with the statutory definition of an expert report. We conclude the trial court abused its discretion by overruling Badhiwala's objection to it on this ground. *See Palacios,* 46 S.W.3d at 878.

### b. Charles D. Marable, M.D.

■ In his report, Marable states that he is a neurologist, with extensive experience dealing with psychiatric patients. He also reviewed hospital notes and related generally the same background information outlined above about Kimberly's treatment at Green Oaks, with somewhat more detail. Marable's report focuses on the medical causes of acute psychotic episode and the side effects of psychiatric medications, specifically NMS. He stated that, in his professional opinion, Kimberly

> suffered acute neuroleptic malignant syndrome episode, which was aggravated by the fact she was stressed, somewhat dehydrated, agitated, on lithium and Depakote, and then given multiple doses of intramuscular Haldol, a total of 20 mg, as well as another 10 mg of Zyprexa, Ativan and Benadryl. In all reasonable medical probability, these combinations of medications produced the neuroleptic malignant syndrome, in all reasonable medical probability, which led to the acute cause of her death....

Marable opined as to the standard of care and stated that Leftin, Williamson, and Sayed failed to meet the standard of care by failing "to perform an adequate medical history and physical" although "[i]t appears a psychiatric exam was done, but there was no medical history and physical on the chart"; to obtain the specific laboratory studies, although "[t]hey obtained drug urinalysis and drug studies from other hospitals, but were not done at the Green Oaks facility"; "poor documentation and progress notes"; and "to realize that the Haldol and Zyprexa given to this patient in all reasonable medical probability caused neurolpetic malignant syndrome."

Because Marable did not mention Badhiwala by name anywhere in his report, his report does not provide a fair summary of the standard of care applicable to Badhiwala and inform him of his conduct being called into question. *See Palacios,* 46 S.W.3d at 878; *Bogar v. Esparza,* 257 S.W.3d 354, 364 (Tex.App.-Austin 2008, no pet.) (report deficient by failing to identify "in any way" person whose conduct is subject of opinions on statutory elements); *Eichelberger v. Mulvehill,* 198 S.W.3d 487, 490 (Tex.App.-Dallas 2006, pet. denied) (report inadequate because it did not mention physician by name or summarize ways in which physician breached standard of care or caused patient any injury). Because Marable's report does not represent a good faith effort to comply with the statutory definition of an expert report, we conclude the trial court abused its discretion by overruling Badhiwala's objection to it on this ground. *See Palacios,* 46 S.W.3d at 878.

We resolve Badhiwala's first issue in his favor.

### B. Disposition on Appeal

In his second issue, Badhiwala argues he is entitled to dismissal because, as to him, the Favorses provided "no report" leaving the trial court with no discretion other than to dismiss their claims against him with prejudice. The Favorses argue they are entitled to remand to correct deficiencies, if this Court determines their expert reports fail to comply with statutory requirements and reverses the trial court's dismissal order.

■ In *Petty,* 310 S.W.3d at 137–38, this Court considered the proper disposition

when an appellate court disagreed with the trial court's conclusion that an expert report was adequate. We recognized two categories of expert reports: deficient and absent. *See id.* (citing *Leland,* 257 S.W.3d at 207–08; *Cook v. Spears,* 275 S.W.3d 577, 581 (Tex.App.-Dallas 2008, no pet.)). We concluded that the supreme court had not recognized a third category—"a report so lacking in the necessary elements that it does not rise to the level of being a report at all"—and we declined to do so. *Id.* When a report that the trial court found adequate is instead found deficient by the court of appeals, the proper disposition is to remand the case to the trial court to consider whether to grant the plaintiff a thirty-day extension to cure the deficiency. *See Leland,* 257 S.W.3d at 207; TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c). Applying this precedent, we resolve Badhiwala's second issue against him.

## V. CONCLUSION

Based on our resolution of Badhiwala's two issues, we reverse the trial court's order and remand this case to the trial court for further proceedings.