**Opinion issued December 20, 2016.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00142-CV

————————————

**GERIATRIC ASSOCIATES OF AMERICA, P.A., Appellant**

**V.**

**STEPHEN ALEX, Appellee**

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-63269**

---

## MEMORANDUM OPINION

In this interlocutory appeal, appellant Geriatric Associates of America, P.A. is challenging the trial court's order denying its motion to dismiss the healthcare liability claims filed against it by appellee Stephen Alex. GAA argues that the trial court abused its discretion by denying the motion to dismiss because Alex's expert's

report does not comply with the requirements of Chapter 74 of the Civil Practice & Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West Supp. 2016), § 74.402 (West 2011). We affirm.[1]

## Background

Alex underwent cardiovascular surgery at Texas Methodist Hospital in San Antonio, Texas, in March 2013. After his surgery, Alex was referred to SSC Kerrville Hilltop Village Operating Company LLC a/k/a Hilltop Village Nursing and Rehabilitation Center for a post-surgical rehabilitation program in order to recover from the surgery before eventually returning home. Alex's physicians at Methodist noted that sternal precautions were necessary for his rehabilitation because he had a large incision down his chest from the surgery which had not fully healed.

---

[1] The parties disagree as to whether GAA, individually, can challenge the sufficiency of the report as to its employee, Dr. Milton Shaw, when Dr. Shaw is not challenging the sufficiency of the report. Although we have not found any legal authority that expressly addresses this point, we find the Texas Supreme Court's opinion in *TTHR Ltd. Partnership v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013) to be instructive. In *Moreno*, the plaintiff asserted that the hospital was liable because of its own direct negligence, as well as its vicarious liability for the negligence of its nurses and two of its doctors. *Id.* at 43. Although the doctors were defendants in the suit, they were not parties to the appeal. Nevertheless, the Supreme Court considered the hospital's challenge to the sufficiency of the report with respect to the vicarious liability claim and held that because the reports were adequate to support the plaintiff's claims against the doctors, "the trial court did not abuse its discretion by finding [the plaintiff]'s reports adequate as to the claim that [the hospital] is vicariously liable for actions of the doctors." *Id.* at 44.

Alex was admitted to Hilltop on March 22, 2013, to begin his rehabilitation program. Milton Shaw, M.D., Hilltop's medical director, was Alex's attending physician at Hilltop and supervised his treatment. Eight or nine days after Alex's surgery, members of Hilltop's staff instructed Alex to support his full weight on the parallel bars while walking on a treadmill. While attempting to perform this exercise, Alex experienced "a severe and sudden pain in his sternum." He was transported to a nearby hospital several hours later, where he was diagnosed with sternal dehiscence. Alex was then transferred back to Methodist where he underwent surgery to repair his sternum the next day.

Alex subsequently filed suit against GAA, Hilltop, and Dr. Shaw. In his petition, Alex alleged that GAA was liable for its own negligence with respect to the care, services, treatment, and supervision of treatment provided to him, as well as vicariously liable for the negligent acts or omissions of its employees and agents. Alex served GAA with a report prepared by his expert, Janice K. Smith, MD, MPH. GAA objected to the sufficiency of the report and filed a motion to dismiss pursuant to Civil Practice and Remedies Code section 74.351. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. After a hearing, the trial court denied GAA's motion to dismiss.

This interlocutory appeal followed.

**Discussion**

In four issues, GAA argues that the trial court abused its discretion when it denied the motion to dismiss because Dr. Smith's expert report does not satisfy the requirements of Chapter 74 with respect to Alex's direct liability claim against GAA or his vicarious liability claim against GAA that is based on Dr. Shaw's conduct. Specifically, GAA contends that Dr. Smith is not qualified to opine as to GAA's standard of care or give legal opinions with respect to Alex's direct liability claim. GAA further contends that Dr. Smith's opinions as to the applicable standard of care, any breaches thereof, and causation are conclusory, with respect to both Alex's direct and vicarious liability claims.

## A.     Chapter 74 Expert Reports

Section 74.351 of the Civil Practice and Remedies Code serves as a "gate-keeper" through which no medical negligence causes of action may proceed until the claimant has made a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE § 74.351; *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claim has merit. *See Am. Transitional Care Ctrs. of Tex., Inc. v.*

4

*Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001). A report that merely states the expert's conclusions as to the three statutory elements of standard of care, breach, and causation does not fulfill these two purposes. *Id.* at 879. The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). The trial court may not draw any inferences, but must rely exclusively on the information contained within the four comers of the report. *See Palacios*, 46 S.W.3d at 878.

When a healthcare liability claim involves a vicarious liability theory, an expert report that adequately implicates the actions of that party's agents or employees is sufficient to implicate the party under the vicarious theory. *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) (per curiam). And, if any liability theory has been adequately covered, the entire case may proceed. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013).

**B. Standard of Review**

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Palacios*, 46 S.W.3d at 875. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). However, a trial court has no discretion in determining what the law is

5

or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

## C.     GAA's Vicarious Liability Based on Dr. Shaw's Conduct

Alex's vicarious liability claim against GAA is based on Dr. Shaw's conduct. GAA argues that Dr. Smith's report does not comply with Chapter 74 because the report does not provide specific information as to the applicable standards of care, how Dr. Shaw allegedly breached those standards, and how such breaches were a substantial factor in Alex's injuries, and is, therefore, conclusory.

In her report, Dr. Smith identified Dr. Shaw as an employee of GAA and stated that Dr. Shaw was Hilltop's Medical Director, as well as Alex's admitting/supervising physician while he was rehabilitating at Hilltop. She further stated that the "prevailing standard of care" for "physicians serving in a medical supervisory role in rehabilitation centers" makes that supervisory physician "responsible for approving the treatment protocols to be followed by the facility's medical support staff," and also "responsible for insuring that those protocols are followed faithfully by the staff."[2]

Dr. Smith stated that because Alex exhibited at least two risk factors for sternal dehiscence (i.e., morbid obesity and a history of poorly controlled diabetes

---

[2]     In light of our disposition, we need not address the other standards of care and Dr. Shaw's alleged breaches of those standards that Dr. Smith identified in her report.

6

mellitus), the standard of care also required that "sternal precautions be observed during the first 4 to 12 weeks, following surgery" in order to avoid undue stress to his sternum.

The report further stated that although "Hilltop was aware of the need to follow sternal precautions in directing Mr. Alex's physical rehabilitation," Hilltop's nursing staff directed Alex, a morbidly obese patient, "to perform an exercise that involved supporting his entire weight on parallel bars while walking on a treadmill" only eight or nine days after his surgery. According to Dr. Smith, this exercise involved three activities that are specifically prohibited for patients like Alex who require sternal precautions (i.e., lifting, pushing, or pulling more than ten pounds, full weight-bearing through upper extremities, and activities that cause excessive Valsalva maneuver). Dr. Smith further explained that "it was during this period of prohibited exercise that Mr. Alex exhibited a severe and sudden pain in his sternum, clear evidence of sternal dehiscence caused by the mechanical stress to his chest produced by the exercise."

According to Dr. Smith, "no copies of Hilltop's post-surgical exercise protocols were provided in the medical records [she] reviewed, and without such review it is impossible to determine whether those protocols were inadequate to protect at-risk patients such as Mr. Alex, or whether the correct protocols existed and were simply ignored by the staff at Hilltop." Dr. Smith opined that "[e]ither case

would represent a failure to meet the standard of care for treating such patients, and the concurrent failure of Dr. Shaw to insure that either the correct protocols were in place or that the medical staff was in fact following said protocols." Dr. Smith further stated that:

> Because of Dr. Shaw's systematic failure to provide oversight over [Alex's] treatment and insure that the treatment plan being followed for [Alex] was both safe and effective, Hilltop staff under Dr. Shaw's supervision both as Medical Director for Hilltop and admitting/supervising physician for [Alex] engaged [Alex] in rehabilitative exercises that were specifically prohibited for patients with "sternal precautions" such as [Alex], causing [Alex]'s sternum sutures to break apart. . . . Dr. Shaw is therefore directly and vicariously responsible to a high degree of medical certainty for . . . the initial injury to [Alex]'s sternum . . . .

Dr. Smith's report stated that Dr. Shaw had a duty to Alex to insure that the correct "safety protocols regarding post-surgery exercise" for patients like Alex were in place, and that Hilltop's medical staff were following said protocols. Dr. Smith inferred from the lack of post-surgical exercise protocols in the medical records provided by GAA that the protocols in place at the time of Alex's injury were either inadequate or that "the correct protocols existed and were simply ignored by the staff at Hilltop." She also explained that the correct protocols for a patient with sternal precautions would have prohibited Alex from attempting the upper-body exercise that Hilltop's medical staff directed him to perform only a week after his surgery. According to Dr. Smith, this exercise, prohibited by the appropriate protocols, placed undue stress on Alex's sternum, and caused Alex's sternal dehiscence.

The report provided GAA and Dr. Shaw with a fair summary of Dr. Smith's opinions concerning the applicable standard of care and how Dr. Shaw failed to meet that standard. *See Palacios*, 46 S.W.3d at 880. The report also informed GAA and Dr. Shaw of the specific conduct that Alex called into question, i.e., "implement[ing] (or allow[ing] to be implemented under his supervision) an upper-body exercise program, including the use of parallel bars, on a morbidly obese patient who had just undergone cardiac surgery and was instructed to take sternal precautions." Dr. Smith's report is sufficient with regard to standard of care and breach. *See id.* at 879. Dr. Smith's report also explained that it was this conduct by Dr. Shaw that caused Hilltop's staff to direct Alex to perform an exercise that, not only would have been prohibited by the proper protocols, but also directly caused Alex's sternal dehiscence. Thus, Dr. Smith's report provided a factual basis for her statements and she linked those factual statements to her conclusion that Dr. Shaw's specific actions or inaction ultimately caused Alex's injury. *See Wright*, 79 S.W.3d at 52.

GAA also challenges the accuracy of Dr. Smith's opinions with respect to the applicable standard of care. According to GAA, the "nebulous" standard of care articulated by Dr. Smith "is an impossible standard for anyone to meet. In short, this is a legal standard (and a dubious one at that) masquerading as a standard of care." Whether Dr. Smith's opinions regarding the applicable standard of care are correct, however, is an issue for summary judgment, not a motion to dismiss under Chapter

9

74. *See Methodist Hosp. v. Shepherd–Sherman*, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Sanjar v. Turner*, 252 S.W.3d 460, 467 n.6 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding that doctor's arguments that he did not owe duty to patient as described in expert report was issue for summary judgment rather than motion to dismiss) and *Wissa v. Voosen*, 243 S.W.3d 165, 169–70 (Tex. App.—San Antonio 2007, pet. denied) (same)).

Citing to *Methodist Hospital of Dallas v. King*, GAA also argues that Dr. Smith's report is deficient with respect to causation because Dr. Smith simply concludes, without explanation, that Dr. Shaw's failure to train and ensure that proper "protocols" are followed resulted in Alex's injuries. 365 S.W.3d 847 (Tex. App.—Dallas 2012, no pet.). *King*, however, is distinguishable because in that case, the court noted that the plaintiff, not the expert, "infer[red] a breach by Methodist based on the occurrence of King's fall, gaps in the medical records, and breaches by Methodist's personnel." 365 S.W.3d at 851. The court further noted that "[a]lthough in some instances it may be permissible for an expert to make inferences in a report based on medical history or other facts, [the expert]'s report does not make such inferences, and we are precluded from guessing as to what she meant or intended with respect to how Methodist's alleged breaches caused King's fall." *Id.* (citing *Palacios*, 46 S.W.3d at 878). Here, Alex's expert, Dr. Smith, drew reasonable inferences about Dr. Shaw's breaches from gaps in the medical records. She also

explained how each of those breaches led to Alex's sternal dehiscence. This is sufficient under section 74.351. *See Patel v. Williams*, 237 S.W.3d 901, 905–06 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding expert report sufficiently set forth causation when it presented chain of events beginning with contraindicated prescription and ending with patient's death).

Because Dr. Smith's report satisfies Chapter 74's requirements with respect to Alex's negligence claim against Dr. Shaw, the trial court did not abuse its discretion by finding the report adequate as to Alex's claim that GAA is vicariously liable for Dr. Shaw's actions. *TTHR Ltd. Partnership v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013). Furthermore, because the trial court did not abuse its discretion by finding the report adequate as to Alex's claim that GAA is vicariously liable for Dr. Shaw's action, Alex's suit against GAA can continue in its entirety and we need not consider whether the report is also sufficient with respect to Alex's direct liability claim against GAA. *See Potts*, 392 S.W.3d at 632.

We overrule GAA's first, second, third, and fourth issues.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Bland, Massengale, and Lloyd.

11