**Affirmed and Memorandum Opinion filed February 18, 2021.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## NO. 14-19-00751-CV

**ANIL SINHA, MD, Appellant**

**V.**

**ROGER NIEBUHR, Appellee**

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 91026-CV**

## M E M O R A N D U M   O P I N I O N

In his second appeal in this case, appellant Dr. Anil Sinha argues that the trial court abused its discretion when it denied his motion to dismiss appellee Roger Niebuhr's health care liability claims against him based on Niebuhr's failure to file an expert report in compliance with section 74.351 of the Civil Practice and Remedies Code. Dr. Sinha contends that Niebuhr's amended expert report fails to show a causal relationship between Dr. Sinha's alleged breach of the standard of care and Niebuhr's injuries. We affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Dr. Sinha performed a laparoscopic appendectomy on Niebuhr and later the same day, July 16, 2015,[1] Dr. Sinha released Niebuhr to go home. After experiencing pain, Niebuhr returned the next day. A computed tomography (CT) scan revealed three collection areas of air, blood, and fluid. Dr. Sinha gave Niebuhr pain medication and again released him to go home.

Niebuhr returned the next day and remained under Dr. Sinha's observation and care under a regimen of intravenously administered antibiotics until July 20, when Dr. Sinha again released Niebuhr to go home. Niebuhr claims Dr. Sinha breached the standard of care during the period beginning the day after his appendectomy (July 17, 2015) up to his discharge on July 20, 2015, ("the Post-Appendectomy Care Period"). From the date of his appendectomy through the penultimate day of the Post-Appendectomy Care Period, Niebuhr's white blood cell count continued to elevate. Niebuhr spent the next three days at home in continued discomfort.

When Niebuhr returned to Dr. Sinha on July 23, 2015, Dr. Sinha discovered Niebuhr's white-blood-cell count had elevated significantly, and the same night, Niebuhr was transferred to Memorial Hermann Hospital. The day after he arrived at Memorial Hermann, doctors performed an exploratory laparoscopy and installed a drain. Despite these measures, Niebuhr's condition continued to decline, and three days later, on July 28, 2015, Niebuhr underwent open abdominal exploration surgery, which revealed a "necrotic appendiceal base with leakage of fecal matter from the cecum into the peritoneum" — a condition that could not be resolved without major surgical intervention. He required "a right hemicolectomy (removal

---

[1] All facts regarding the treatment discussed here derive from what is provided in the expert report at issue.

of the right colon) and an end ileostomy, leaving him in intestinal discontinuity."

Niebuhr remained at Memorial Hermann until he was discharged on August 3. His path to recovery required use of an ostomy bag for six months before "re-attachment" surgery.

*Lawsuit and First Appeal*

Niebuhr sued Dr. Sinha, alleging that Dr. Sinha acted negligently during the Post Appendectomy Care Period and his alleged actions and omissions resulted in the necrotic condition that required life-changing surgery.

Dr. Sinha moved to dismiss Niebuhr's claims, asserting the expert report of Dr. Paul J. Chestovich fell short in explaining the standard of care at issue in the case and in explaining the causation theory. The trial court denied the motion, Dr. Sinha appealed that ruling to this court, and we reversed, finding the report deficient on the element of causation. In the opinion in the first appeal, the court noted Dr. Chestovich's expert report suffered from three deficiencies as to the causation element because it lacked the following essentials:

(1)  an identifiable location of the intestinal leak;[2]

(2)  information about when the necrosis developed or when the persistent leakage process began that led to necrosis;[3] and

(3)  an explanation "free from inconsistency" how an earlier surgery (performed by Dr. Sinha during the Post Appendectomy Period) would have made any difference in the outcome of Niebuhr's

---

[2] "Dr. Chestovich has not clearly shown that the leak location was ever identified. Though he seems to make general observations about the location of the leak, he does not reveal precisely the area that would have needed to be addressed." *Sinha v. Niebuhr*, No. 14-17-00937-CV, 2018 WL 6836930, at *5 (Tex. App.—Houston [14th Dist.] Dec. 28, 2018, no pet.) (mem. op.)("*Sinha I*").

[3] The Court stated "that while [Dr. Chestovich] states that the persistent leakage of intestinal contents initiated the process that caused necrosis, he does not identify when that process began or when necrosis developed." *Sinha*, 2018 WL 6836930, at *5.

condition.[4]

This court denied Niebuhr's motion for en banc reconsideration, and Niebuhr did not file a petition for review in the Supreme Court of Texas.

Because this court found that it was not "impossible for the deficiencies in the report to be cured," we reversed the trial court's order and remanded the case to give the trial court an opportunity to consider whether to grant Niebuhr a thirty-day extension to cure the deficiencies. *See Sinha v. Niebuhr*, No. 14-17-00937-CV, 2018 WL 6836930, at *6 (Tex. App.—Houston [14th Dist.] Dec. 28, 2018, no pet.) (mem. op.).

*The Amended Report and this Appeal*

Niebuhr requested and the trial court allowed him an opportunity to cure the deficiencies in the expert report. After Niebuhr filed his amended expert report, Dr. Sinha filed another motion to dismiss alleging that the amended report remained deficient as to causation. Dr. Chestovich's amended report includes nearly everything in the first report, plus facts set out in medical records not previously mentioned (including some facts that our opinion suggested would be useful). The amended report supplements the standard of care described in the "Medical Opinion" section and adds significant content to the "Results" section. The new parts aid Dr. Chestovich's explanation of the causation theory. The trial court denied Dr. Sinha's motion and that ruling is the basis of Dr. Sinha's current appeal.

---

[4] "Dr. Chestovich provides no explanation why the laparoscopic surgery performed eight days after the appendectomy — if performed earlier — would have yielded clear results in identifying the source of the leak, and in addressing the problems. Accordingly, in the absence of such an explanation, the report fails to offer a reason free from inconsistency that but for Dr. Sinha's failure to perform the exploratory laparoscopic surgery, the outcome would have been any different." *Sinha*, 2018 WL 6836930, at *6.

4

## III. ISSUE AND ANALYSIS

In his sole issue, Dr. Sinha asserts the trial court abused its discretion in denying his motion to dismiss because the amended expert report was inadequate for failing to establish a causal link between Dr. Sinha's conduct and Niebuhr's injuries.

We apply an abuse-of-discretion standard when reviewing a trial court's decision as to the adequacy of an expert report. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). The trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). Although we may not substitute our judgment for that of the trial court, the trial court has no discretion in determining what the law is or applying the law to the facts. *Id.*; *Sanjar v. Turner*, 252 S.W.3d 460, 463 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Under his sole issue, Dr. Sinha complains that Dr. Chestovich's amended report fails to correct the deficiencies we outlined in the first appeal and argues that certain statements made in the amended report are conclusory and factually unsupported. We address these arguments in the context of the overarching issue of whether the trial court abused its discretion in finding the amended expert report on causation amounted to an objective good-faith effort to comply with the definition of an expert report provided in section 74.351(r)(6).

Under section 74.351, a claimant, not later than the 120th day after the date a health-care liability claim is filed, must serve on each party one or more expert witness reports addressing liability and causation. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j) (West, Westlaw through 2017 R.S.); *Lewis v. Funderburk*, 253 S.W.3d 204, 205 (Tex. 2008). The statute defines an "expert report" as

[A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (West, Westlaw through 2017 R.S.). A trial court shall grant a motion challenging the adequacy of the expert report if the report is not an objective good-faith effort to comply with the definition of an expert report provided in section 74.351(r)(6). *Id.* §§ 74.351(*l*), (r)(6). A trial court's inquiry is limited to the four corners of the report. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

The report must provide sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the plaintiff's claims have merit. *See id.* at 539. Omission of any of the statutory elements prevents the report from being a good-faith effort. *See id.* A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *See id.* In providing the expert's opinions on these elements, the claimant need not marshal evidence as if actually litigating the merits at trial or present sufficient evidence to avoid summary judgment. *See id.*

Proximate cause encompasses two components: (1) foreseeability and (2) cause-in-fact. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred. *Id.* For the amended report to suffice as to causation, in it Dr. Chestovich must explain "how and why" the alleged negligence

6

during Post-Appendectomy Care Period caused the development of necrosis that resulted in significant removal of Niebuhr's intestines, set forth the basis for his statements, and link his conclusions to specific facts. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2018). Thus, for the amended report to survive the challenge, Dr. Chestovich would have to explain how the allegedly negligent conduct caused Niebuhr's injuries. *See id*. at 226.

Dr. Chestovich's amended report includes two standards of care that call for exploratory laparoscopic surgery at different points and for different purposes during the Post-Appendectomy Care Period:

- First, the report explains that the day after the appendectomy when presented with a patient in Niebuhr's condition—with increasing pain, significant post-operative bleeding in various places—the standard of care called for Dr. Sinha to perform exploratory laparoscopic surgery "to determine the source of the bleeding and evacuate the hematoma, verify there was not continued bleeding from the appendiceal artery, and verify the integrity of the appendiceal stump."

- Second, the report summarizes Niebuhr's elevating white-blood-cell count from the time of the appendectomy to the penultimate day of the Post Appendectomy Care Period, and provides that on that day (July 19), given Niebuhr's elevating or abnormal white blood count, "the standard of care in Niebuhr's case called for Dr. Sinha to perform exploratory laparoscopic surgery to investigate the source of infection."

The amended report includes explanations of how and why Dr. Sinha's failure to perform an exploratory laparoscopic surgery on or about July 17 and July 19 caused the development of necrosis that resulted in significant removal of Niebuhr's intestines:

> The CT scan performed at BRH on 7/17/15 showed evidence of early post-operative bleeding. Based upon the findings at surgery on 7/28/15, in reasonable medical probability, the appendiceal artery

7

which Dr. Sinha clipped in surgery was the source of internal bleeding Niebuhr was experiencing on 7/17/15. Had Dr. Sinha performed exploratory laparoscopic surgery, in reasonable medical probability he would have identified and controlled the source of bleeding and simultaneously identified any intestinal perforation.

Niebuhr's WBC count was increasing despite the removal of appendix. After Niebuhr's readmission to the hospital and the WBC had increased to 16.4, Niebuhr's WBC increased further to 16.9 despite administration of intravenous antibiotics. In reasonable medical probability the cecum was leaking intestinal contents at this point and was the source of Niebuhr's increasing WBC. Had Dr. Sinha performed an exploratory laparoscopic surgery on or about 7/19/15 as the standard of care called for him to do, he would have identified and repaired the leakage in the cecum, while simultaneously identifying any bleeding.

. . .

Necrosis is a process of degradation of living tissues that takes place over time. The necrosis in Niebuhr's cecum was caused by exposure of his tissue to constant leakage of intestinal contents into his peritoneum through the appendix wound at his cecum. The presence of blood creates a medium in which bacteria thrive, allowing the infection to continue. While it is impossible to precisely identify when the tissue became necrotic, in reasonable medical probability there was no necrotic tissue that had developed within 3-4 days after the appendectomy surgery performed by Dr. Sinha. If Dr. Sinha had met the standard of care and performed exploratory laparoscopic surgery during the July 17, 2015 timeframe, the bleeding and intestinal leakage would have been identified and Niebuhr would not have developed necrosis.

. . .

. . .Had Dr. Sinha performed exploratory laparoscopic surgery on July 19, 2015 after it was apparent that Niebuhr had a worsening infection, as the standard of care called for, in reasonable medical probability the resulting surgeries at Memorial Hermann hospital would not have been necessary. Thus, Roger Niebuhr would not have developed life-threatening peritonitis and required a colon resection and ileostomy. As a result, Mr. Niebuhr required additional procedures, and required an ostomy bag for 7 months, as well as the other potential lifelong

8

complications associated with such surgeries. These operations and the associated morbidity would not have been necessary had the standard of care been followed.

Dr. Chestovich's explanation in the amended report provides a straightforward link between Dr. Sinha's alleged breaches of the standard of care, and the respective consequences, which ultimately led to Niebuhr's injury. The report is not conclusory, and fairly addresses the three deficiencies we noted in our previous opinion.

(1) *The amended report provides factual support for the presumed ability to pinpoint the location of the intestinal leak.*

In the first appeal, the panel was concerned that none of the medical records available to Dr. Chestovich revealed that the leakage site could be located, and the inability to locate the leakage was inconsistent with Niebuhr's causation theory that depends on Dr. Sinha locating and fixing the leakage site during the Post-Appendectomy period. In his amended report Dr. Chestovich addresses that concern, as he identifies the leakage location in an area near the appendectomy staple line. Specifically, the report includes content from medical records not included in the original report—it supplies notes from the post-operative pathology report that the defect located in "the cecum [was] immediately adjacent to a 3.5cm in length stapled line (probable appendectomy site), measuring 3.0 x 2.5 cm."

Dr. Sinha concedes this new contribution addresses one of the court's stated concerns, but Dr. Sinha emphasizes that staples were also noted to be closed, and argues that the amended report never explains why the stapled-up appendectomy site and the leakage site are related. The pathologist's interpretation of the CT scan identifying the "full thickness defect" immediately adjacent to the "(probable appendectomy site)," while not factually conclusive that the appendectomy caused the defect, is relevant to show that the defect existed at all relevant times, and was

capable of being observed and located. This court's opinion in *Marvin v. Fithian* is instructive on this point. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.).

In *Marvin*, we considered whether a doctor's report setting out that Dr. Marvin breached the standard of care by failing to timely conduct a physical exam after Fithian presented with evidence of an infection following laparoscopic gastric band surgery. *Id.* On appeal, Dr. Marvin argued that the plaintiff's expert's opinions on causation lacked factual support. The court addressed this concern, describing each of the facts linking the expert's causal conclusion:

> Dr. Martin [the plaintiff's expert] explained that surgery could have been performed prior to deterioration of Fithian's organs if the source of her post-surgical infections had been discovered on February 3. In the report, Dr. Martin described a series of missed chances for an accurate diagnosis of the cause of Fithian's infections. Dr. Martin stated that Fithian would have been timely diagnosed with peritonitis, and surgery would have been performed to close the hole in her stomach if a qualified physician had performed a physical exam on February 3. Dr. Martin explained that surgery would have eliminated the source of the Fithian's peritonitis and "almost all of her subsequent problems." Dr. Martin opined that Fithian would not have developed kidney failure and pulmonary insufficiency if this course of action had been followed. Dr. Martin stated that each day Dr. Marvin missed an opportunity to intervene, more of Fithian's tissues was destroyed by infection and her period of disability was increased. According to Dr. Martin, Fithian suffered from life-threatening peritonitis, secondary pulmonary insufficiency, pleural effusions with toxic cellular products, and secondary kidney failure because she was not timely diagnosed and treated.

*Id.* at 3. We concluded that the above facts sufficed to support the causation opinion. *Id.* at *3. We also addressed the defendant's contention that the plaintiff's expert engaged in an impermissible inference that the pin hole in Fithian's stomach existed on the earlier date. *Id.* at *4. We concluded that Dr.

Martin's conclusion amounted to a permissible inference gleaned from the medical records, that the source of the infection to be the same pinpoint as that referenced as discovered as leaking by Dr. Martin during surgery four days later. *Id*. We conclude that the amended report in this case similarly details missed opportunities while similarly relying on permissible inferences gleaned from the medical records.

In short, the addition of the pathologist's observation to the report adds some factual basis for the proposition that the leakage site would have been located by Dr. Sinha had he performed one of the proposed exploratory laparoscopic surgeries. *See id*.

> *(2) The report provides background information about the timing of the persistent leakage of intestinal contents that initiated the process that allegedly caused necrosis, when that process began, and permissible conclusions about when necrosis developed.*

Dr. Sinha complains that "the crucial questions posed by this Court—when did the process of necrosis begin and when did it develop—remain unanswered."

In his amended report, Dr. Chestovich notes that it is impossible to know precisely when the necrotic tissue developed but posits "in reasonable medical probability there was no necrotic tissue that had developed within 3-4 days after the appendectomy surgery performed by Dr. Sinha." Dr. Sinha argues that this statement equates to speculation. We disagree: these statements find support in the report. *See Naderi v. Ratnarajah*, 572 S.W.3d 773, 780 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Specifically, Dr. Chestovich explains the necrotic process—the degrading of living tissues over time, and how the presence of blood on the tissue creates a medium in which bacteria thrive, allowing the infection to continue. This explanation, coupled with other facts in the report about Niebuhr's treatment and condition—that he was on intravenously-administered antibiotics

that would have offset (to some extent) the infection during that timeframe—supports Dr. Chestovich's conclusion that the necrotic tissue had not yet developed within three to four days after the appendectomy. *See id.*

Similarly, Dr. Chestovich's statement that "[w]hen Niebuhr presented at Memorial Hermann Hospital on 7/23/15 the necrosis had already developed" was a conclusion fairly supported in the context of his explanation of the necrotic process, the removal intravenously-administered antibiotics, and Niebuhr's doubled white-blood-cell count taken on that date. *See id.*

*(3) The report provides an explanation free from inconsistency that the failure to perform an earlier laparoscopy altered the outcome.*

Dr. Sinha complains that the report does not consistently explain how an exploratory surgery in the specified timeframe—July 17 to July 20—would have made any difference in the outcome of Niebuhr's condition, when the July 24 exploratory surgery did not reveal the source of the intestinal leak. This argument, a point made in our first opinion about the first report, relies in part on a comparison to our sister court's decision in *Karkoutly v. Guerrero*, involving medical negligence claims based on allegations of a delayed exploratory procedure. 13-17-00097-CV, 2017 WL 6379795, at *4 (Tex. App.—Corpus Christi-Edinburg Dec. 14, 2017, no pet.).

The *Karkoutly* case involved a situation where the expert "did not mention any new information that was gleaned from the exploratory surgery, or whether the exploratory yielded any progress toward resolving the patient's condition." *Id.* We concluded the report in that case comparable to the first report because like the report in that case, the first report did not describe the exploratory surgery as yielding any clearer information about source of the infection.[5]  *Sinha I*, at *6.

---

[5] Though deficient, the deficiency of the first report in this case (the *Sinha I* report) was not so

And like the *Karkoutly* report, the first report in this case lacked any clear reference to the medical records identifying the source of the infection. Though we concluded the comparison to *Karkoutly* compelling under the first report, the information and opinions in the amended report render it distinguishable from *Karkoutly*.

The amended report draws from the data available from the diagnostic tests, the CT scans, blood tests, and pathology reports, and the moments during the Post-Appendectomy Care Period where Dr. Sinha passed on opportunities to conduct laparoscopic exploration, and supplies factual basis for Dr. Chestovich's opinion that such intervention would have revealed that the appendiceal artery which Dr. Sinha clipped in surgery was the source of internal bleeding Niebuhr was experiencing on July 17, the same source of what elevated his white blood cell count on July 19. The amended report chronologically illustrates Niebuhr's changing intestinal landscape as first consisting of a blood leak near the appendectomy staple lines (July 17), then leaking intestinal contents prior to the development of necrosis (July 19), then leaking intestinal contents from organs deteriorating from necrosis (July 24). In short, Dr. Chestovich's amended report identifies the leak location with greater precision, educates the parties and court about the complications associated with an intestinal leak and about the necrotic process, and estimates the timeframe when the necrotic process began. The first report did not. Understanding the necrotic process, the existence of the leak and

---

severe as the deficiency in *Karkoutly*. Whereas the *Karkoutly* expert report failed to note *any* information gleaned or any progress toward patient-recovery from the exploratory surgery, the *Sinha I* report notes that the exploratory surgery yielded the discovery of Niebuhr's intestinal leak. But beyond noting the discovery of its existence, the *Sinha I* report fell short of showing that the leak's source had then or ever been located. Thus, the circumstance described in the first report begged the question: *How could the leak be repaired if it could never be located?* The amended report, with clearer reference to the probable location of the leak, eliminates this question.

the progression of the leak, provided the basis for showing *why* an earlier exploratory procedure would have avoided the same outcome for Niebuhr.

Dr. Sinha's arguments do not overcome the reality that, at worst, if an exploratory surgery had occurred on the 17th or 19th and only yielded information revealing the existence (but not the location) of an intestinal leak — that such a discovery, simply made earlier than it was, would have prompted intervention at a more expedited pace than actually occurred. Dr. Sinha seems to acknowledge that Dr. Chestovich's report illustrates a window in time wherein Dr. Sinha's early intervention could have avoided the unfavorable outcome, but calculates this to be a comparable sliver in time. These concerns are better suited for a jury.

The report draws a line directly from Dr. Sinha's decision not to perform a laparoscopic surgical intervention during the Post-Appendectomy Care Period, to a delay in diagnosis (identifying the intestinal leak) and the alleged proper treatment, to the ultimate injury (necrosis). *See Abshire*, at 225; *see also Marvin*, at * 4.

### III. CONCLUSION

Dr. Chestovich's amended expert report has cured the deficiencies identified in the court's opinion in the first appeal and meets the standards applicable to causation opinions. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). We therefore overrule Dr. Sinha's sole appellate point and affirm the trial court's order denying his motion to dismiss.


/s/    Randy Wilson
Justice

Panel consists of Justices Spain, Poissant and Wilson.

14